## STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JOHN WESLEY GOSSER, DEFENDANT-APPELLANT

Argued April 27, 1967—Decided November 27, 1967.

*Mr. Marvin D. Perskie* for defendant-appellant (*Messrs. Perskie and Perskie,* attorneys).

*Mr. William J. Hughes,* First Assistant County Prosecutor, for plaintiff-respondent (*Mr. James A. O'Neill,* Cape May County Prosecutor, attorney).

The opinion of the court was delivered

PER CURIAM. Defendant appeals from a conviction for second degree murder in the shot-gun slaying of his wife at their home in Sea Isle City, Cape May County, on November 5, 1965. The sentence was 12 to 20 years imprisonment.

The State's proofs made it abundantly clear that defendant committed the act. This he never challenged, although insisting that the prosecution prove its case. He did not take the stand. There were only two real issues at the trial. One was the defense of criminal insanity at the time of the offense. In summation, his counsel sought a verdict of not guilty by reason of such insanity rather than an acquittal. He admits that the proofs were in conflict on the requisites of the *M'Naghten* rule and agrees that there can be no valid challenge, on the score of sufficiency or weight

of the evidence, to the rejection of the defense by the verdict of conviction. On the other side, the real issue was whether the State was entitled to the first degree verdict it sought. (It did not ask the death penalty.) While there was evidence, as defendant candidly states in his brief, from which pre-meditation and the other elements necessary to establish murder of that degree could have been found, the jury also rejected this contention by returning the second degree verdict.

Defendant's grounds for reversal and a new trial are confined to allegedly erroneous pre-trial and trial rulings relating principally to the admission of evidence, the State's summation and the court's charge, of which some are suggested to be of a character calling for automatic reversal regardless of whether prejudice in fact resulted. Any claimed errors not of this character are, of course, cause for reversal only if "* * * it appears from the entire record of the proceedings had upon the trial that the defendant thereby suffered manifest wrong or injury." *R. R.* 1:5-1(a). Determination of whether this criterion has been met must be had in the light of, among other things, the issues actually tried and the verdict rendered.

We are thoroughly satisfied upon a review of the whole record that the defendant had a fair trial, that the verdict was one which the jury could very properly reach upon the proofs, and that the grounds urged fall far short of reversible error. While the case was hard fought and, indeed counsel too often became overly vigorous, more so on the defense side, Judge Francis handled the entire proceedings carefully and judiciously. Some of the evidence should be sketched in order to make clear our comments upon defendant's points.

Defendant, a man about 50 years of age, had been married to the victim for some 20 years. They operated a beer distributing business in a suburb of Philadelphia for a time. The business was sold in 1955 and the couple moved to Sea Isle City. Defendant thereafter had no steady employment

and little income beyond that derived from occasionally taking parties out fishing on his boat. His wife was a person of some means, however, and they apparently lived well. The marriage was childless and not a happy one. There was continual quarrelling and bickering over many things, among them money, the unwillingness of the wife to have children, and the company each kept. Defendant was pictured as a passive and weak man; his wife was asserted to be a nagging spouse. He drank heavily for a time, but was said to have tapered off some time before the shooting. The wife, on the other hand, had become a steady imbiber by the time of her death. In 1964 the parties separated under a formal agreement with a property settlement, but returned to living together a few months later.

The State's proofs established that on the day of the shooting a friend of the defendant's was at the home for dinner. He left about 6:00 P. M. when the defendant and his wife commenced quarrelling. After dark the next afternoon, a female friend of the wife's, who lived several miles away, received a telephone call from the defendant. His voice was distraught; he said something terrible had happened and asked her to come to the house. Instead she called the Sea Isle City police and a patrolman was immediately dispatched. Upon arrival he knocked on the front door. Defendant finally came stumbling down the stairs and opened the door. He appeared groggy, upset and crying, with caked blood on his pajamas and his face. The officer asked what the trouble was and he said that he had killed his wife. He was directed to sit on the couch in the living room and remain there. The officer returned to the patrol car in front of the home and radioed to headquarters for assistance. A sergeant and another patrolman arrived within a very few minutes. In the interim, the first officer stood watch outside the house.

The three policemen again knocked on the door, then partly open, and called for the defendant, who was not in the living room. When he finally reappeared at the foot

of the stairs, the sergeant asked what had happened. Defendant said he had shot his wife. When asked where she was, he replied "upstairs". The three then entered the house and the sergeant and one officer raced upstairs and searched from room to room. The other patrolman, at the direction of his superior, remained downstairs to watch the defendant, then seated on the couch. At this point, the defendant started complaining to this officer, without being questioned, about his wife's nagging and said that "all of a sudden something just snapped" and "I ought to get the electric chair for this". He also volunteered that he had taken a box of pills and wanted a glass of water.

During the upstairs search for Mrs. Gosser, the police officers noticed an empty gun case sticking out of the closet in one of the bedrooms and an open box of shot-gun shells on a dresser in the hall. Mrs. Gosser's body was found in the last bedroom entered, lying on the floor near the bed in her night clothing, with a gaping wound in the abdomen. It was obvious she was dead. Autopsy established the time of death as probably two or three hours after the preceding evening's meal and the cause as a single charge from a shot-gun at close range. Blood on the bed clothing indicated she was probably sitting on the bed when struck. Apparently she had slipped to the floor face down and had been later turned over on her back. After the discovery of the body, the sergeant asked the defendant where the gun was and it was soon found under the bed in his bedroom. There was one spent shell in the chamber and another on the floor nearby. A clip had to be used to insert two shells in the weapon, as had been done. Subsequent tests established that six and one-half pounds of pressure on the trigger was required to discharge it.

Following the locating of the gun, the sergeant went downstairs, advised defendant he was under arrest and applied handcuffs. The officer then telephoned the prosecutor's office and a local physician. The latter arrived within minutes and pronounced Mrs. Gosser dead. An assistant prose-

cutor and a county detective reached the scene shortly. The physician proceeded to examine defendant at the prosecutor's request in order to determine whether he needed any kind of medical attention in view of his statement about taking a box of pills. The doctor testified over objection that the defendant said he had taken 17 tablets of a form of sleeping medication and that the examination disclosed diminished reflexes and some confusion as to time, but that defendant knew his predicament.

The county detective testified, also over objection, that during the doctor's examination, the defendant, without prompting or interrogation, made rambling statements of which the witness took notes: that he didn't mean to do it, his wife was always on his neck; that he wanted to go to the state mental hospital; that he was having hallucinations and delusions and had nightmares all night; and that he had put two shells in the gun, one to use on himself, and then used the pills instead.[1]

These events give rise to two grounds urged by the defendant. The first is that the testimony of the physician and detective of the statements made by defendant during the physical examination was erroneously admitted, calling for automatic reversal because the statements were obtained in violation of the principles laid down in *Miranda v. State of Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed. 2d* 694 (1966). (The statements were made before *Miranda;* the trial was after it.) The second is that the same result is required because the trial court wrongly refused to suppress physical evidence procured by an allegedly illegal search and seizure, as well as the indirect fruits thereof. We find no merit in either contention.

The exclusionary rule of *Miranda* bars from evidence statements of a defendant made during in-custody in-

---

[1] There was other testimony from which the jury could infer that, after he awoke from the sleep induced by the overdose of medication and before he had telephoned his wife's friend, he had tried unsuccessfully to shoot himself in his bed with the second shell in the gun.

terrogation unless he has been advised of his right to remain silent and of his right to have counsel present, to be furnished if there is financial inability to hire, and has knowingly and intelligently waived such rights. The decision recognized, however, at least two exceptions. One is general on-the-scene questioning as to facts surrounding a crime, and the other, statements freely volunteered without compelling influences. 384 *U. S.*, at *pp.* 477–478, 86 *S. Ct.*, at *p.* 1629, 16 *L. Ed. 2d,* at *pp.* 725–726. Defendant's statements that he had killed or shot his wife made to the first arriving policeman and then to the sergeant clearly fall in the first category and defendant does not here complain about their admission, as well he could not. While those testified to by the physician and county detective may be said to have been made while in custody, the proof is uncontradicted that they were completely volunteered and not the product of any interrogation and so come within the second exception. The trial judge was most careful to bar all statements made after the detective first stated he asked a question. We find nothing bringing the *Miranda* rule into play.

Defendant further suggests that, even if that be so, these statements were not truly "voluntary" in the fundamental fairness sense because of defendant's situation and condition at the time. We cannot agree. The State's testimony is clearly adequate to support the view that defendant thoroughly understood his situation and that the statements were completely unsolicited expressions of remorse or attempts at explanation and rationalization of what he fully realized he had done. The trial judge was eminently justified in admitting them and there was no error.

The contention of an illegal search and seizure is frivolous. The motion to suppress, made and denied before trial pursuant to *R. R.* 3 :2A–6 (a), included not only the shotgun, box of shells, spent shells and bloody night clothes and bed linen found by the officers shortly after their arrival, but also, as alleged fruits of the poisonous tree, photographs

of the premises (and presumably of the corpse), ballistic reports, autopsy reports and the like later obtained. Defendant's brief further suggests the latter category includes defendant's volunteered statements just discussed. His thesis is that the warrantless search of the bedroom area of the house preceded the formal arrest and handcuffing of the defendant and so was not incident to the arrest. He suggests that it would have been valid, however, if the defendant had first been placed under arrest, probable cause for which he urges existed at least as soon as he told the officers he had killed his wife. The logical extreme of such hairsplitting would be that the police would have had to obtain a search warrant before they could go upstairs to see whether Mrs. Gosser was dead or still living.

There are several answers to this contention. The Constitution proscribes only "unreasonable" searches and "* * * should not be read to quarrel with the common sense of a situation". *State v. Fioravanti*, 46 *N. J.* 109, 122 (1965), certification denied 384 *U. S.* 919, 86 *S. Ct.* 1365, 16 *L. Ed.* 2d 440 (1966). To dash upstairs to see if the victim was not beyond aid was certainly called for. The gun case, box of shells and the bloody clothing and linen were in plain view. Defendant himself told the officers where to find the gun, after the locating of which the formal arrest was pronounced. The whole episode was essentially a single continuous event. The search did not first uncover justifying cause for the arrest; that already existed on defendant's own admission. The precise sequence of happenings is not dispositive in such a situation. *State v. Doyle*, 42 *N. J.* 334, 343 (1964). Again, to be more technical about it, it can also be said that there was a sufficient detention on probable cause to amount to an arrest grounding a valid search incident thereto when the police sergeant directed one of the patrolmen to guard the defendant then sitting on the living room couch while the other officers went upstairs. *Cf. State v. Contursi*, 44 *N. J.* 422, 433 (1965). Finally, and perhaps most significantly, the exi-

gencies of the situation justified the search made. The situation is analogous to the "hot pursuit" thesis upheld in *Warden, Maryland Penitentiary v. Hayden,* 387 *U. S.* 294, 87 *S. Ct.* 1642, 18 *L. Ed.* 2d 782 (1967), decided since oral argument herein. The same case also held that, where a right to search exists, the seizure may validly encompass "mere evidence" as well as fruits and instrumentalities of the crime or contraband. There was no error in the denial of the motion to suppress or in the admission in evidence of the articles seized and the indirect fruits of the search.

Defendant also claims reversible error in the admission in evidence of a single black-and-white photograph of the corpse as discovered in the bedroom and of the testimony of the wife's lawyer at the time of the 1964 separation concerning certain admissions by defendant of misconduct toward the wife made at a conference of the three. We see no error in either situation.

■ The photograph had some probative value in the light of the real issues tried and while somewhat inflammatory, we cannot say that its logical relevance was unquestionably overwhelmed by the picture's capacity for prejudice so as to require a holding that the trial judge abused his discretionary authority in admitting it. *State v. Coleman,* 46 *N. J.* 16, 26–27 (1965), certification denied 383 *U. S.* 950, 86 *S. Ct.* 1210, 16 *L. Ed.* 2d 212 (1966); *State v. Hale,* 45 *N. J.* 255, 262 (1965), *appeal dismissed* 384 *U. S.* 884, 86 *S. Ct.* 1291, 16 *L. Ed.* 2d 1001 (1966); *State v. Smith,* 32 *N. J.* 501, 525 (1960), *cert. den.* 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961).

■ Before permitting the lawyer's testimony, the judge quite properly conducted a hearing outside the presence of the jury to determine whether the attorney received the admissions in the course of a lawyer-client relationship with the defendant, which was the basis of defendant's objection to the evidence. His finding was correct on the proofs that the attorney represented only the wife and not the husband at the time and that the admissions were made

in an adversary situation rather than in the course of a lawyer-client relationship and in professional confidence, and thus not privileged. *N. J. S.* 2A:84A–20.

Turning to the matter of alleged prejudicial comment by the State in summation, defendant grounds his strongest argument for reversal on this portion:

"The Court will also instruct you, ladies and gentlemen of the jury, that as part of your verdict, because the defense is insanity, but you must also determine whether or not Mr. Gosser 'still remains insane. Now, there is no evidence to this effect. The State is not even contending that. *If you people acquit him, he will walk out of this courtroom.* There is no contention that he is insane." (Emphasis added).

Counsel's immediate objection was sustained and the jury then and there instructed to disregard the statement. At the conclusion of the summation, defendant moved for a mistrial on this and other grounds, which was denied. The court gave no further specific admonition in its charge, although defendant asked for it, and declined to charge defendant's request that the jury should not consider or speculate whether the defendant would "remain [sic] in a mental institution or go free" if they found him not guilty by reason of insanity. It simply charged, without comment and without objection by either side, that if defendant was found not guilty by reason of insanity at the time of commission of the offense, the jury also was required to make an additional finding as to whether he "continued to be insane" at the time of trial.

*N. J. S. A.* 2A:163–3, incorporated into *R. R.* 3:7–9(e), requires a jury which acquits for insanity at the time of the commission of the offense so as to specify in their verdict and also to find specially "whether or not such insanity continues". The section provides that "if the jury should find by their verdict that such insanity does continue, the court shall order such person into safe custody and commit him to the New Jersey state hospital at Trenton until such time as he may be restored to reason".

 Thus the jury had before it the questions whether defendant was insane at the time of the homicide and, if so, whether the defendant was still insane at the time of trial. The prosecutor was entitled to discuss both issues. Defense counsel impliedly urged the jury to find the defendant insane at the time of trial, saying:

"This is the type of testimony that the State is seeking to bring before you to stigmatize and put this man in a jail, *not in a mental institution where he belongs*, but in a jail for the rest of his life. * * *" (Emphasis added).

The prosecutor says he merely responded to this position of the defense, and did so both because there was no evidence that the alleged insanity continued to the time of trial and because the defense proof, if accepted, could be understood affirmatively to say that the insanity had disappeared by the time of trial.[2] But defendant says the prosecutor's remarks could also be understood to suggest that the jury should find defendant guilty even though satisfied that he was not guilty by reason of insanity, and should do so lest he go free. If so understood, the argument would be im-

---

[2] Two of the defense witnesses were staff physicians at the Vroom (criminal) building of the New Jersey State Hospital in Trenton. Shortly after the State's psychiatrists first examined the defendant in the county jail where he was held awaiting trial, at which time they had found him in a disturbed anxiety state, he was civilly committed to the state hospital on the initiation of defense counsel. These two witnesses were the physicians in charge of defendant during his stay at the hospital, which continued until he was discharged on or about September 30, 1966, a short time before the criminal trial commenced. Just prior to the discharge, a hearing was held in the trial court pursuant to *N. J. S.* 2A:163-2 as to defendant's mental ability to stand trial. Such competency was found. The discharge indicated that defendant was no longer in a condition which required even civil confinement in a mental hospital.

Certain matters related to defendant's stay in the state hospital give rise to another of defendant's grounds for reversal which can well be disposed of at this point. After the commitment, defense counsel sought to control the extent of defendant's history the hospital might obtain from him or others and the tests which might be

proper, since, obviously, a jury may not be asked to return a false verdict merely because the jury may not like what the law says will follow upon a truthful verdict. *Cf. Aponte v. State,* 30 *N. J.* 441, 449 (1959); *State v. White,* 27 *N. J.* 158, 170–179 (1958); *State v. Laws,* 50 *N. J.* 159, 186–187 (1967). See *Annot.,* 44 *A. L. R. 2d* 978 (1955) and *People v. Sorenson,* 231 *Cal. App. 2d* 88, 41 *Cal. Rptr.* 657 (*Dist. Ct. App.* 1964), hearing denied by *Cal. Sup. Ct.* (1965).

■ However, the trial court sustained defendant's objection to the prosecutor's statement and immediately instructed the jury to disregard it. This action, and the instruction in the charge to decide the case solely on the evidence and in accordance with the law as given by the court, dissipated any possibility that the jury might have thought the prosecutor had suggested it is proper to bring in a verdict contrary to the law and the facts. This being so, we see no error. Nor do we see any possible harm. In fact, the defense claim of insanity was extremely thin and the opinions of the defense psychiatrists depended substantially upon defendant's unsworn claim of amnesia, as to which there was no independent, substantive proof in the case. See *State v. Lucas,* 30 *N. J.* 37, 78–80 (1959).

---

administered, as well as directing the defendant as to how he should answer certain questions. He also sought to bar the prosecution from pre-trial access to the hospital records. This course led to a rash of motions by both sides as a result of which the court in effect ordered defendant's full cooperation with the hospital authorities in all respects. He impounded the hospital records and reports and refused access to either side until a month before trial when he directed they be made available to both. Defendant says this was prejudicial error on the theory that they fall in the class of reports of privately employed defense psychiatrists because he initiated the commitment proceedings. The point is completely without substance. This was a commitment to a public institution by court order for essentially a public purpose, no matter who commenced it, and the medical records thereof should be available in advance of trial to both prosecution and defense.

Only two of defendant's other contentions warrant mention. One is a claim that certain statements in the prosecutor's summation amounted to comment on the defendant's failure to take the witness stand in violation of the federal constitutional principle laid down in *Griffin v. State of California,* 380 *U. S.* 609, 85 *S. Ct.* 1229, 14 *L. Ed. 2d* 106 (1965). See *State v. Lanzo,* 44 *N. J.* 560 (1965). In the defense summation, some references were made to alleged gaps in the State's case as to the precise details of the shooting, although counsel concluded with an appeal that the jury bring in a verdict of not guilty by reason of insanity as "the only verdict that this case holds". Close to that conclusion he had said: "I have worked with this man and I have tried to present everything that I possibly could in his defense except himself. It is obvious why he was not presented as a witness." (The latter sentence was not elaborated upon; we can only surmise that he was referring to defendant's claim to the examining psychiatrists that he had an amnesia of a good part of the event).

The prosecutor, in his summation, where he was arguing for a first degree conviction, projected inferences said to fairly arise from the undisputed circumstantial evidence making out the necessary elements of that crime. In the course thereof, he said:

"\* \* \* there is no testimony that there was any other gun that belonged in that case. There was no other explanation as to why that case was leaning out of the closet like it was. There was no explanation as to why the shells were on that table in an open condition, no explanation. \* \* \*"

The defendant did not object, but raised the point as a ground for mistrial, or alternatively, for a curative instruction, at the conclusion of the summation. The application was denied. Laying aside the propriety of waiting until the end of a summation to object to alleged erroneous argument, we are satisfied defendant's contention is without merit.

██ One could probably safely say in the light of all the circumstances of the case that, even if there were a constitutional error in what the prosecutor said, it meets the federal test of being harmless beyond a reasonable doubt, as laid down in *Chapman v. State of California,* 386 *U. S.* 18, 87 *S. Ct.* 824, 17 *L. Ed. 2d* 705 (1967). Also, there is the not yet completely settled matter of whether a prosecutor is justified in the type of comment complained of here solely because the defendant in his summation had offered an excuse as to why he did not take the stand and thereby sought to minimize any adverse effect of his failure to do so. *Cf. State v. Schultz,* 46 *N. J.* 254, 259 (1966), certification denied 384 *U. S.* 918, 86 *S. Ct.* 1367, 16 *L. Ed. 2d* 439 (1966); *State v. Lowery,* 49 *N. J.* 476, 486 (1967). See generally Maguire, *Evidence of Guilt,* § 2.061 (1959). But we prefer to rest our conclusion on the basis that the prosecutor's choice of words in the quoted passage amounted to nothing more than fair reference to legitimate inferences from non-production of evidence, which a prosecutor is entitled to make and which cannot be said to constitute comment on failure to take the stand. See *State v. Sinclair,* 49 *N. J.* 525, 549 (1967). The prosecutor here had been talking in terms of "inferences" from the proof. In the complained of language, still speaking in the same context, he used the phrase "no explanation". It had the same connotation as if he had said instead "no contrary inference", which would have been quite unobjectionable. This kind of a question should not turn on mere semantics.

██ The other contention we should comment upon is the claim that the trial judge should have charged, as defendant requested, voluntary manslaughter as a possible verdict on the theory of "a slaying committed in a transport of passion or heat of blood induced by an adequate provocation, provided the killing occurs before the passage of time sufficient for an ordinary person in like circumstances to cool off". *State v. Guido,* 40 *N. J.* 191, 209 (1963). The difficulty here is, of course, that there was no sufficient evi-

dence that the killing was in passion or heat, let alone with legally adequate provocation. Such evidence, if it was the fact, could only have been furnished by the defendant and he declined to testify. Moreover, realistically, the whole thesis of his defense was insanity. The instruction was properly refused.

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For reversal*—None.