# State of Vermont v. Stephen Picknell

[454 A.2d 711]

No. 192-80

Present: Barney, C.J., Billings, Hill, Underwood and Peck, JJ.

Opinion Filed November 2, 1982

*James P. Mongeon,* Rutland County State's Attorney, Rutland, for Plaintiff-Appellee.

*Barry E. Griffith,* Rutland, for Defendant-Appellant.

Hill, J. During the early morning hours of July 6, 1979, a retired Rutland businessman and his wife were abducted from their home by two assailants, one masked and one unmasked. While the masked assailant guarded the wife, the unmasked assailant forced the husband to go to his local bank. Following the instructions of his abductor, he withdrew a substantial portion of his savings. After turning the savings over to his abductor, he was taken to an abandoned foundry, later identified as the Patch-Wegner Building, where he was bound and left in the cellar. At approximately the same time, the masked assailant forced the wife from her home, drove her around the neighborhood in one of her cars for about 10 minutes, and then both returned to the couple's garage. The masked assailant left the wife bound in the car's back seat. She managed to free herself and run to a neighbor's house for help. A short while later, her husband freed himself and immediately contacted the police.

It was the State's contention at trial that the masked abductor was the defendant, Stephen Picknell. On January 23, 1980, defendant was found guilty after a jury trial of two counts of kidnapping with the intent to extort money. 13 V.S.A. § 2403. Following the denial of defendant's motion for judgment of acquittal, V.R.Cr.P. 29(c), and defendant's motion for a new trial, V.R.Cr.P. 33, judgments of conviction were entered on May 26, 1980. Defendant filed a timely notice of appeal. We affirm.

Defendant briefs three issues for our consideration: first, whether defendant's rights as guaranteed both by *Miranda* v. *Arizona,* 384 U.S. 436 (1966), and by 13 V.S.A. § 5234 were

violated when the trial court admitted into evidence certain statements made by him; second, whether a court order pursuant to V.R.Cr.P. 41.1 compelling defendant to produce handwriting exemplars violated defendant's rights guaranteed under Chapter I, Article 10 of the Vermont Constitution; and third, whether the trial court abused its discretion by permitting an in-court comparison of defendant's physical features with those of the masked assailant. These issues will be addressed in turn, and further facts necessary to our analysis will follow below.

## I.

Defendant first excepts to the trial court's decision to allow into evidence statements made by him to the police. Specifically, defendant asserts that two distinct groups of statements, those made at the Patch-Wegner Building, and those made while in custody at the police station, should have been suppressed. Defendant contends that the admission of the first group of statements violated his *Miranda* rights, and the admission of the second group of statements violated those statutory rights guaranteed by 13 V.S.A. § 5234 (the public defender statute).

Evaluation of the admissibility of the first group of statements must start with a review of the facts surrounding defendant's detention at the foundry. At or about 10:30 a.m. on the morning of the kidnappings, an officer of the Rutland Police Department was sent to "preserve the scene" at the Patch-Wegner Foundry as part of the kidnapping investigation. His instructions were to detain and question any persons who might appear at the scene. At approximately 11:00 a.m., the officer spotted the defendant in the building. He detained the defendant, and asked him a few general questions, such as his name, address, place of birth, and his reasons for being on the premises. No *Miranda* warnings were given at this time. The officer next radioed the police station to determine what, if anything, should be done about defendant. A second officer was quickly dispatched to the foundry. The second officer repeated the same type of questions, again without giving the *Miranda* warnings. At this time, neither officer had any reason to believe that the defendant was in any way connected with the kidnappings. Shortly thereafter, the officers were

ordered by radio to arrest the defendant on the basis of an outstanding bench warrant in an unrelated district court matter. All questioning ceased, and the defendant was transported to the police station.

Defendant insists that this initial detention and questioning at the Patch-Wegner Foundry constituted a custodial interrogation. Citing as authority *Miranda* v. *Arizona, supra,* and *State* v. *Hohman,* 136 Vt. 341, 392 A.2d 935 (1978), defendant asserts that the failure of the officers to issue *Miranda* warnings at the outset of his detention was a direct violation of the Fifth Amendment privilege against self-incrimination. He argues that since the exculpatory nature of his responses is irrelevant to the issue of admissibility, *Miranda* v. *Arizona, supra,* 384 U.S. at 477, the statements made at the foundry should have been suppressed. We disagree.

Defendant's reliance on *Miranda* and *Hohman* is misplaced. The chief concern of the United States Supreme Court in *Miranda* v. *Arizona, supra,* was the problem of "incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warning of constitutional rights." *Id.* at 445; *State* v. *Hohman, supra,* 136 Vt. at 349, 392 A.2d at 940. Such tactics jeopardized the privilege against self-incrimination, *Miranda* v. *Arizona, supra,* 384 U.S. at 478, thus violating those "restraints society must observe consistent with the Federal Constitution in prosecuting individuals for crime." *Id.* at 439. As a result, the Supreme Court held that the prosecution "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation . . . unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444; *Michigan* v. *Mosley,* 423 U.S. 96, 99–100 (1975). Consequently, the effect of *Miranda* was to require law enforcement officers, prior to any custodial interrogation, to advise the detained individual of his or her *Miranda* rights. *Oregon* v. *Mathiason,* 429 U.S. 492, 494 (1977); *State* v. *Howe,* 136 Vt. 53, 58, 386 A.2d 1125, 1128 (1978).

The Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of

his freedom of action in any significant way." *Miranda* v. *Arizona, supra,* 384 U.S. at 444. However, the *Miranda* Court specifically recognized two exceptions to its definition: first, general, on-the-scene questioning as to facts surrounding a crime were not to be considered custodial interrogation; and second, statements freely volunteered without compelling influences were likewise excluded. *Id.* at 477–78; *State* v. *Oakes,* 129 Vt. 241, 254, 276 A.2d 18, 26 (1971); *State* v. *Gosser,* 50 N.J. 438, 446, 236 A.2d 377, 381 (1967). It was essential that the high court articulate exceptions to the rule of *Miranda,* for when read literally, its definition of custodial interrogation could arguably encompass almost any instance of police interrogation. As the Court itself later recognized:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. . . . *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Oregon* v. *Mathiason, supra,* 429 U.S. at 495. Thus, *Miranda* and its progeny serve to safeguard an individual's right against self-incrimination, while at the same time preserving the traditional function of police officers in investigating crime. *Miranda* v. *Arizona, supra,* 384 U.S. at 477.

 Defendant argues that the initial questioning at the foundry was a custodial interrogation. As we have said before, the determination of whether or not an individual is in custody is an objective test, based on the totality of circumstances. *State* v. *Hohman, supra,* 136 Vt. at 349, 392 A.2d at 940; *United States* v. *Hall,* 421 F.2d 540, 544–45 (2d Cir. 1969). The facts as found by the trial court clearly establish that the officers were engaged in a general on-the-scene inquiry when they questioned the defendant. They had no reason to suspect that defendant was in any way involved in the

kidnapping, and were merely following orders to question anyone who appeared on the scene at the foundry. Thus, this questioning falls well within *Miranda's* first exception. Consequently, the trial court properly ruled that there was no custodial interrogation. Since the procedural safeguards of *Miranda* only attach where defendant is subjected to a custodial interrogation, the trial court's decision to admit the first group of statements into evidence is affirmed.

Turning next to the second group of statements, the facts as found by the trial court are as follows. After the initial detention at the foundry, the defendant was promptly transported to the Rutland Police Station. Once all questioning at the foundry had ceased, no subsequent interrogation took place until one of the officers read defendant his *Miranda* rights one-half hour later at the station. The defendant was never asked to sign a formal waiver of his rights. Upon being advised of his rights, however, the defendant stated that he would see what the questions were before deciding whether he would answer them. Moreover, he specifically stated that he did not wish to have an attorney present at the time. The subsequent interrogation, which lasted approximately one hour, focused entirely on the kidnappings.

Prior to trial, defendant moved to suppress this second group of statements, claiming violations of both *Miranda* and 13 V.S.A. § 5234. The trial court held that *Miranda* had been complied with, that defendant knowingly and intelligently waived his rights, and that the decision to waive the right to counsel relieved the police of their obligation to call defendant's attorney. The defendant does not question the validity of the waiver under the guidelines of *Miranda*. Instead, he contends that there was a failure to obtain a waiver of his right to an attorney, as required by 13 V.S.A. § 5234, *at the precise moment he was arrested* at the foundry. He relies on a narrow interpretation of the phrase "commencement of detention," 13 V.S.A. § 5234(a)(2), and insists that the officers should have obtained an immediate waiver prior to transporting him to the police station. Their failure to obtain a timely waiver, he urges, meant that the officers were still obliged to contact his attorney of record in the matter for which the bench warrant was issued. Since noncompliance with 13 V.S.A. § 5234(a)(2) requires suppression of statements ob-

tained as a result of such noncompliance, see *State* v. *Nicasio,* 136 Vt. 162, 166, 385 A.2d 1096, 1099 (1978), defendant concludes that the subsequent statements obtained at the police station were inadmissible.

The obligation of Vermont law enforcement officers regarding notification of counsel is explicitly set out in 13 V.S.A. § 5234. The statute provides that when a person is detained by law enforcement officers without charge or judicial process, and if the person is not represented by counsel in a situation where he or she is entitled to counsel, the law enforcement officer shall:

> (1) Clearly inform him of the right of a person to be represented by an attorney and of a needy person to be represented at public expense; and

> (2) If the person detained or charged does not have an attorney *and does not knowingly, voluntarily, and intelligently waive his right to have an attorney when detained or charged,* [the law enforcement officer shall] notify the appropriate public defender that he is not so represented. This shall be done upon commencement of detention, formal charge, or post-conviction proceeding, as the case may be . . . .

13 V.S.A. § 5234(a)(1) and (2) (emphasis supplied).

 In construing 13 V.S.A. § 5234, we have stated that "the statutory policy [is] one of requiring notice to a public defender absent other representation, with a later determination of [financial] need or its absence, and reimbursement if indicated." *State* v. *Nicasio, supra,* 136 Vt. at 166, 385 A.2d at 1099. In essence, the statute recognizes *Miranda*'s concern for bad faith interrogation of individuals accused of a crime without the presence of counsel, and reflects this state's policy of securing for those individuals an immediate right to counsel. *State* v. *Duff,* 136 Vt. 537, 539, 394 A.2d 1145, 1146 (1978). It relieves law enforcement officers of the task of determining financial need, but safeguards the duty to furnish counsel to indigent individuals accused of serious crimes. *State* v. *Nicasio, supra,* 136 Vt. at 166, 385 A.2d at 1099. However, a detained individual may "knowingly, voluntarily, and intelligently waive his right to have an attorney when de-

tained or charged." 13 V.S.A. § 5234(a)(2). Since the right to counsel is a fundamental right not easily waived, the State must establish that a knowing, voluntary and intelligent waiver was secured prior to any custodial interrogation. *State* v. *Badger,* 141 Vt. 430, 439, 450 A.2d 336, 341 (1982); *Tague* v. *Louisiana,* 444 U.S. 469, 470–71 (1980); *North Carolina* v. *Butler,* 441 U.S. 369, 373 (1979). If there is ample evidence to support the trial court's finding of a waiver, we will not disturb the ruling. *State* v. *Badger, supra,* 141 Vt. at 442, 450 A.2d at 343; *State* v. *Breznick,* 134 Vt. 261, 265, 356 A.2d 540, 542 (1976).

 The flaw in defendant's argument is that it ignores. the fact that no custodial interrogation took place from the time he was arrested until the time he was issued his *Miranda* rights. Had statements been obtained during this interim period, they would have been inadmissible, since both *Miranda* and 13 V.S.A. § 5234(a) would have been violated. However, once defendant was advised of his *Miranda* rights, which included the right to an attorney, the trial court found that he knowingly, voluntarily, and intelligently waived those rights. Once the right to counsel was waived, the provisions of 13 V.S.A. § 5234(a) were fully complied with. Since there was ample evidence to support a finding of waiver, the ruling of the trial court will not be disturbed.

## II.

The second issue presented is whether defendant's rights as guaranteed by Chapter I, Article 10 of the Vermont Constitution were violated when he was compelled by court order to produce handwriting exemplars. Defendant submits that the trial court erred in refusing to grant his pretrial motion to suppress the exemplars. In denying the motion, the court held that absent violent or brutal conduct in obtaining the evidence, an accused may be compelled to produce such evidence consistent with the Vermont Constitution. We agree.

 The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any Criminal Case to be a witness against himself." "[T]he privilege protects an accused only from being compelled to testify

against himself, or otherwise provide the State with evidence of a testimonial or communicative nature . . . ." *Schmerber* v. *California,* 384 U.S. 757, 761 (1966). It does not protect an individual from being compelled to produce real or physical evidence, such as submitting to fingerprinting, photographing, or even physical measurements. *Id.* In specifically upholding the constitutionality of handwriting exemplars, the Supreme Court has reasoned that an exemplar, "in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside [the Fifth Amendment's] protection." *Gilbert* v. *California,* 388 U.S. 263, 266–67 (1967); *United States* v. *Wade,* 388 U.S. 218, 222–23 (1967).

Where evidence is admitted in violation of the Fifth and Fourteenth Amendments, this Court is bound by federal constitutional principles. *State* v. *Badger, supra,* 141 Vt. at 438, 450 A.2d at 341; *State* v. *Rocheleau,* 131 Vt. 563, 566, 313 A.2d 33, 36 (1973). Defendant concedes that handwriting exemplars do not violate the Fifth Amendment's privilege against self-incrimination. See, e.g., *Gilbert* v. *California, supra,* 388 U.S. at 266; *Schmerber* v. *California, supra,* 384 U.S. at 764. Instead, he asserts that this state's privilege against self-incrimination, as guaranteed by Chapter I, Article 10 of the Vermont Constitution, is much broader than the federal privilege. In pertinent part, that provision states that an accused cannot "be compelled to give *evidence* against himself." (Emphasis supplied.) Defendant reasons that Vermont's usage of the word "evidence," which differs from the Fifth Amendment's usage of the word "testimony," must mean that a broader privilege was envisioned by the Framers of the Vermont Constitution. For support, defendant cites a recent decision by the Utah Supreme Court, *Hansen* v. *Owens,* 619 P.2d 315 (Utah 1980), which reflects the minority view that the scope of the privilege is broader. If defendant is correct, then the fact that our decision would then be based on adequate and independent state grounds would limit federal review to a determination of whether Vermont law violates federal law. *State* v. *Badger, supra,* 141 Vt. at 448, 450 A.2d at 346 (citing *Pruneyard Shopping Center* v. *Robbins,* 447 U.S.

74, 79 (1980)); *Delaware* v. *Prouse*, 440 U.S. 648, 651–53 (1979).

Defendant's argument, that the state constitutional privilege is broader in scope than its federal counterpart, is a matter of first impression for this Court. However, the issue has been brought before both the United States Supreme Court and the highest courts in other states. This is not surprising, since our research indicates that the majority of the forty-eight states that have a self-incrimination provision in their respective constitutions use language that differs from the phraseology employed by the Fifth Amendment. *Olson* v. *State*, 484 S.W.2d 756, 760 (Tex. Crim. App. 1972); 8 Wigmore, Evidence § 2252, at 319 n.3 (McNaughton rev. 1961). Specifically, twenty-one states use the phrase "to give evidence," fifteen use "witness against himself," eight use "testify against himself," and the last four have miscellaneous provisions. *Olson* v. *State, supra*, 484 S.W.2d at 760 n.5.

We note with interest that the overwhelming majority of state courts which have confronted the issue have held that the difference in phraseology neither enlarges nor narrows the scope of the privilege. *People* v. *Schmoll*, 77 Ill. App. 3d 762, 396 N.E.2d 634 (1979), *cert. denied*, 447 U.S. 928 (1980); *People* v. *Manson*, 61 Cal. App. 3d 102, 132 Cal. Rptr. 265 (1976), *cert. denied*, 430 U.S. 986 (1977); *Olson* v. *State, supra; State* v. *Moore*, 79 Wash. 2d 51, 483 P.2d 630 (1971); *Opinion of Justices*, 255 A.2d 643 (Me. 1969); *State* v. *White*, 102 Ariz. 162, 426 P.2d 796 (1967); *State* v. *Fisher*, 242 Or. 419, 410 P.2d 216 (1966); *Walton* v. *City of Roanoke*, 204 Va. 678, 133 S.E.2d 315, 318 (1963); cf. *Hansen* v. *Owens, supra*. More importantly, in *Schmerber* v. *California, supra*, the Supreme Court rejected the notion that a difference in phraseology would enlarge the scope of the privilege. In so doing, it articulated a rationale which we have previously found compelling:

> Many state constitutions, including those of most of the original Colonies, phrase the privilege in terms of compelling a person to give "evidence" against himself. But our decision cannot turn on the Fifth Amendment's use of the word "witness." "[A]s the manifest purpose of the constitutional provisions, both of the States and

of the United States, is to protect the compelling of testimony of a self-incriminating kind from a party or a witness, the liberal construction which must be placed upon constitutional provisions for the protection of personal rights would seem to require that the constitutional guaranties, however differently worded, should have as far as possible the same interpretation."

*Id.* at 761–62 n.6 (quoting *Counselman v. Hitchcock,* 142 U.S. 547, 584–85 (1891)).

 The above rationale, which formed the basis for our decision upholding the constitutionality of compulsory blood tests under Chapter I, Article 10, see *State v. Pierce,* 120 Vt. 373, 376, 141 A.2d 419, 422 (1958), is equally applicable to the issue of handwriting exemplars. Thus, we hold that Chapter I, Article 10 of the Vermont Constitution does not bar the use of handwriting exemplars as evidence in a criminal trial. Accordingly, we reject the view espoused by the Utah Supreme Court in *Hansen v. Owens, supra,* and find that the trial court's issuance of an order compelling defendant to produce handwriting examplars was proper.

## III.

The third and final issue raised for our consideration is whether the trial court erred in permitting an in-court comparison of defendant's physical features with those of the masked assailant. On January 7, 1980, defendant filed a motion in limine requesting a hearing out of the presence of the jury to inquire into the trustworthiness and reliability of any attempt by the State to identify defendant as one of the kidnappers. The motion was prompted by an article in the Rutland Herald, on August 24, 1979, which not only outlined the police theory of the kidnappings, but also included mug-shot type photos of defendant and his alleged accomplice. The trial court found that the kidnapping victims had read and saved the article. The fact that defendant had never been identified as one of the abductors, coupled with the fact that no formal, pretrial eyewitness identification procedures had ever been conducted, enhanced the significance of the pretrial publicity. Recognizing the substantial likelihood of misidentification,

the trial court granted defendant's motion. In its ruling, the trial court instructed the State not to have the complaining witnesses identify defendant as the kidnapper unless it could provide some indicia of reliability, out of the jury's presence, which would tend to show that such identification was based on their own observations, rather than on the pretrial publicity. In essence, the trial court analogized the pretrial publicity to a tainted pretrial identification, and in granting the motion, recognized the dangers inherent in such identification, as outlined in *United States* v. *Wade, supra,* 388 U.S. at 228–29, and *State* v. *Girouard,* 135 Vt. 123, 133–35, 373 A.2d 836, 843 (1977).

However, the trial court distinguished an in-court identification from an in-court comparison. The former would have specifically identified the defendant as one of the kidnappers; the latter would merely compare the wife's recollection of her masked assailant's physical features with those of the defendant. The trial court held that the in-court comparison was reliable, since the wife testified on the basis of her observations at the time of the kidnapping. Accordingly, despite defendant's strong objection that such a comparison would be highly prejudicial, the State was permitted to conduct the in-court comparison without a prior voir dire to prove independent reliability. During the direct examination of the wife, the defendant was required to leave the counsel table for inspection by her before the jury. Her comparison was limited to physical features. She testified that defendant's height, build, hair color and length, nose, and protruding Adam's apple were similar to those physical characteristics of her masked assailant. Defendant was never actually identified as one of the kidnappers.

On appeal, defendant asserts that his due process rights were violated when the in-court comparison was conducted without first testing its reliability outside the presence of the jury. We begin by noting that those cases cited by defendant in support of his argument, see, e.g., *Manson* v. *Brathwaite,* 432 U.S. 98 (1977), *Neil* v. *Biggers,* 409 U.S. 188 (1972), all involved some type of tainted pretrial identification procedure, followed by a subsequent in-court identification whose validity was at issue. Were we dealing with a situation involving an in-court identification, as defendant would have us

believe, then the above decisions might be relevant. However, defendant's attempt to equate an in-court comparison to an in-court identification serves only to misstate the issue. As previously noted, there was never any in-court identification of defendant as the kidnapper at trial. Simply put, this is not an in-court identification case. Therefore, our review is limited to a determination of whether the admission of this evidence, via the in-court comparison, was proper in view of the admissibility tests regularly applied by this Court.

 Relevant evidence is evidence with some probative value. "It is evidence 'having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *State* v. *Bevins,* 140 Vt. 415, 419, 439 A.2d 271, 272 (1981) (quoting Fed. R. Evid. 401) ; *State* v. *Patnaude,* 140 Vt. 361, 370, 438 A.2d 402, 405 (1981). If evidence is found to be relevant, it may still be inadmissible if its probative value is outweighed by the danger of unfair prejudice. *State* v. *Bevins, supra,* 140 Vt. at 419, 439 A.2d at 272; *State* v. *Gardner,* 139 Vt. 456, 459, 433 A.2d 249 251 (1981). In other words, this Court must conduct a two part inquiry. First, we must decide whether the admitted evidence was both relevant and material to the subject cause of action. If so, our second consideration is whether the introduction of such evidence was so prejudicial to defendant as to outweigh its probative value.

 In answering these questions, we are mindful of the fact that the admission of evidence is highly discretionary. It is a steadfast rule of this Court that "[a]ny discretionary ruling is not subject to revision here unless it clearly and affirmatively appears that such discretion has been abused or withheld." *State* v. *Polidor,* 130 Vt. 34, 39, 285 A.2d 770, 773 (1971) (quoting *State* v. *Goyet,* 120 Vt. 12, 19, 132 A.2d 623, 630 (1957) ) ; *State* v. *Tatko,* 119 Vt. 459, 463, 128 A.2d 663, 666 (1957). Moreover, the burden of showing prejudicial error rests clearly on defendant. *State* v. *Polidor, supra,* 130 Vt. at 39, 285 A.2d at 773; *State* v. *Truman,* 124 Vt. 285, 290, 204 A.2d 93, 97 (1964).

There is no question that the testimony regarding the physical characteristics of her assailant, as matched against those of defendant, was both relevant and material to the State's attempt to prove its case. The testimony went to the heart of the State's contention that the masked assailant was none other than the defendant. Moreover, the probative value of the evidence outweighed the potential dangers of prejudice. Although a direct identification was impossible, the record does indicate that the witness had more than enough time to view her assailant's physical characteristics. During her captivity, the masked assailant awakened her from her sleep, sat with her in the family den, fetched her a glass of water, and drove her around the neighborhood for a limited period of time. Although confined to the car's back seat, she was able to observe her assailant's back and hair, since he had removed his mask in order to drive. Although she probably lacked the capability of making a positive identification, it was certainly within her means to make a physical comparison. The court below found the testimony to be reliable, and we find nothing in the record which reveals an abuse of discretion.

In so holding, it is not our intention to minimize the potential hazards of in-court comparisons in front of the jury. Such procedures are fraught with dangers. A judicial determination, outside the presence of the jury, of the admissibility of this type of evidence may in fact be prudent and advisable. But while the admission of such evidence demands the trial court's careful scrutiny, the decision to hold voir dire hearings must rest within the sound discretion of the trial court. Furthermore, the defendant was not defenseless in the face of such tactics, for he had at his disposal the power of cross-examination, a most effective way to ascertain truth. *Watkins* v. *Sowders*, 449 U.S. 341, 349 (1981). Indeed, the record indicates that defendant's lengthy cross-examination of the wife regarding her assailant's physical characteristics succeeded in bringing out numerous inconsistencies in her testimony. Moreover, the trial court's instruction to the jury regarding the great care to be taken in weighing the evidence presented was both extensive and thorough. "[T]he proper evaluation of evidence under the instructions of the trial judge

is the very task our system must assume juries can perform."
*Id.* at 347. In sum, we find nothing in the record to support
defendant's claim of prejudice.

*Judgment affirmed.*