## State of Vermont v. Wade Willis

[494 A.2d 108]

No. 82-292

Present: Billings, C.J., Hill, Underwood and Gibson, JJ., and Daley, J. (Ret.), Specially Assigned

Opinion Filed March 22, 1985

462

*John J. Easton, Jr.*, Attorney General, *Elizabeth Grant Rome* and *Robert V. Simpson, Jr.*, Assistant Attorneys General, Montpelier, and *Philip H. White*, Orleans County State's Attorney, Newport, for Plaintiff-Appellee.

*Nancy E. Kaufman*, Montpelier, for Defendant-Appellant.

**Underwood, J.** Defendant appeals from a conviction of first degree murder after a jury trial in the Orleans County Superior Court. The defendant did not contest the fact that he committed the killing but claimed that, because of a mental defect, he was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Thus, defendant advanced an insanity defense under the former 13 V.S.A. § 4801, now 13 V.S.A. § 4801(a). Defendant also defended on a claim of diminished mental capacity.

An overview of the facts pertinent to this appeal follows. On May 21, 1981, the defendant, then sixteen years old, was at the home of his cousin, Roy Bullis, in Morgan, Vermont. Defendant disclosed to Roy Bullis that defendant's girl friend, Terri Weed, was pregnant and that he, the defendant, was the father, Defendant then told Roy Bullis that he was going to kill Terri Weed so that no one would know that she was pregnant. Students at North Country Union High School, which defendant and Terri Weed both attended, already knew of Terri's pregnancy, however, and they also assumed that defendant was the father. This had led to much cruel teasing of defendant by other students at school. After telling Roy Bullis of his intention to kill Terri, defendant borrowed a pair of gloves from him and left to meet Terri Weed.

After leaving the Bullis residence, defendant and Terri were together in the woods behind her house. Defendant beat Terri in the head with a baseball bat until she was unconscious and then he left her for dead. Somewhat later, defendant called Roy Bullis to tell him that Terri was dead, and the two then arranged to meet near defendant's home. Eventually, defendant picked up a shovel and took Bullis to where Terri was lying in the woods. Realizing that she was still alive, defendant hit Terri with the shovel point in the head and stomach. Defendant then dragged her by the hair to another spot in the woods where he began to bury her. Thinking she was still alive, defendant hit her several more times with the shovel before he finished burying her. Defendant and Bullis then left the woods. Defendant later called Bullis and told him to tell anyone who asked about Terri's whereabouts that she had left with two guys in a red car.

Later that afternoon, the Vermont State Police received two anonymous phone calls but learned only that there had been a killing. A little while later, Joseph Bullis, Roy's father, called the state police and said that something terrible had happened in Morgan. A few minutes later, defendant's father, Duane Willis, called to request that the police hurry to his house because there had been a killing behind the Weed residence in Morgan. Corporals Rivard and Johnson left for the Willis residence.

Rivard and Johnson arrived and met Duane Willis in the kitchen of his house. Also present were Mr. and Mrs. Bullis. Mr. Willis appeared to be very upset. Corporal Johnson asked, "What's the problem here?" to which Mr. Willis replied, "My son tells me he killed some girl." He said that the girl was Terri Weed and that her body was in the woods behind Larry Weed's residence. Mr. Willis also told them that Wade was sixteen years old.

Corporal Rivard asked where Wade was, at which time the defendant came from the living room into the kitchen; he said nothing. The officers discussed the situation privately for a few moments, and a short while later, outside the house, Corporal Rivard asked Wade, "[Do] you want to show us where it is?" Defendant nodded his head affirmatively. The officers insisted that Mr. Willis accompany them because the defendant was a juvenile.

The defendant, his father and the two officers then proceeded into the woods behind the Weed residence with the defendant leading the way. The only conversation during the walk was an admonition by Corporal Johnson to stay away from the Weed residence. There was no questioning of the defendant, nor were any words spoken by him.

When the group reached the spot where Terri Weed lay partially buried, the officers checked the wrist for a pulse. They could discern no pulse and concluded that Terri Weed was dead. The officers then placed the defendant under arrest and read him the *Miranda* warnings. At this time, 4:41 p.m., the officers still did not question the defendant. Defendant was taken to the state police barracks shortly after 5:00 p.m. where he was once again advised of his *Miranda* rights, this time in the presence of his mother and father.

The defendant has briefed five issues on appeal. The facts necessary to determine defendant's claims of error will be supplemented as necessary under the individual sections of the opinion dealing with each claim.

## I.

The defendant first claims that the trial court abused its discretion by denying his motion to transfer these criminal proceedings to juvenile court pursuant to 33 V.S.A. § 635(b).[1] At the time the defendant sought the transfer, he was over sixteen years and under eighteen years of age, the age of majority. Recently, we observed that motions under 33 V.S.A. § 635(b) are discretionary and will be reviewed on a case-by-case basis. *State* v. *Jacobs*, 144 Vt. 70, 74–75, 472 A.2d 1247, 1249–50 (1984). We have stated that "[i]t is a steadfast rule of this Court that '[a]ny discretionary ruling is not subject to revision here unless it clearly and affirmatively appears that such discretion has been abused or withheld.'" *State* v. *Picknell*, 142 Vt. 215, 230, 454 A.2d 711, 718 (1982) (citations omitted);

---

[1] Title 33 V.S.A. § 635(b) provides in pertinent part:

 (b) If it appears to any court of this state in a criminal proceeding that the defendant was over the age of sixteen years and under the age of eighteen years at the time the offense charged was alleged to have been committed, . . . that court may forthwith transfer the proceeding to the juvenile court under the authority of this chapter . . . .

see also *State* v. *Savo,* 141 Vt. 203, 208, 446 A.2d 786, 789 (1982).

Defendant argues that the trial court erred in denying his motion for transfer based upon its legal conclusion that the juvenile court's jurisdiction over the defendant would end when he became eighteen years old, by virtue of 33 V.S.A. § 634,[2] and in further concluding that the juvenile court could not assure adequate rehabilitation of the defendant in less than two years. Defendant argues that the 1981 amendment to 33 V.S.A. § 634, namely § 634(b),[3] would have applied to the defendant and given the juvenile court jurisdiction over him up to age twenty-one. The State disputes this; it argues that the amended § 634(b) would not apply to the defendant and that the trial court correctly concluded that the juvenile court's jurisdiction would terminate on defendant's eighteenth birthday. We agree with the defendant's contention that the trial court failed to exercise its discretion properly in ruling upon his motion to transfer. The trial court based its denial on an erroneous conclusion that, if it were to grant the motion to transfer, the juvenile court would be able to retain jurisdiction over the defendant only until the time of his eighteenth birthday.

■■ At the time of the charged offense, the juvenile court could retain its jurisdiction over juveniles only until their eighteenth birthday. 33 V.S.A. § 634. Effective July 17, 1981, the juvenile court could extend its jurisdiction over juveniles until their twenty-first birthday. 33 V.S.A. § 634(b). Both statutory law and case law normally prohibit the retroactive application of new statutory law. Title 1 V.S.A. § 214(b) provides that "[t]he amendment . . . of [a] . . . statutory pro-

---

[2] Title 33 V.S.A. § 634 (Supp. 1981) (now amended as 33 V.S.A. § 634(a)) provided:

Jurisdiction of a child obtained by the juvenile court in a proceeding under this chapter shall be retained by it, for the purposes of implementing the orders made and filed in that proceeding, *until the child attains his majority,* unless terminated by order of the court prior thereto. (Emphasis added.)

[3] Title 33 V.S.A. § 634(b) (1981) provides:

The juvenile court, in its discretion, may retain jurisdiction over a child up to twenty-one years of age if the child has been found to have committed a delinquent act.

vision . . . shall not: (2) [a]ffect any *right* . . . acquired prior to the effective date of the amendment . . . ." (Emphasis added.) The applicable law is that which is in effect at the time of the occurrence of the facts which give rise to the *rights* in question. *State* v. *Matthews,* 131 Vt. 521, 523, 310 A.2d 17, 19 (1973). "Thus, the essential inquiry is whether 'the act which triggers application of the amended statute occurs after the effective date of the amended statute.' " *Carpenter* v. *Vermont Department of Motor Vehicles,* 143 Vt. 329, 333, 465 A.2d 1379, 1382 (1983) (citations omitted).

■■ Utilizing the above mode of analysis, the State contends that 33 V.S.A. § 634(b), which would allow the juvenile court to retain jurisdiction over the defendant until he reached the age of twenty-one, could not be applied under the facts of the present case. This contention, however, is based on the erroneous assumption that the defendant *had a right,* prior to the effective date of the statutory amendment, to be placed under the jurisdiction of the juvenile court for a period not to exceed his eighteenth birthday. In fact, the defendant *had no right* to remain under the jurisdiction of the juvenile court for any period of his life, unless and until the juvenile court obtained jurisdiction over the defendant pursuant to 33 V.S.A. § 635(b) (Supp. 1981). Under the facts of the present case, any such transfer of jurisdiction of the case from superior court to juvenile court could not have occurred prior to the effective date of the amendment to 33 V.S.A. § 634. Therefore, the defendant had *no rights* to be affected by the amended 33 V.S.A. § 634(b), and the application of 33 V.S.A. § 634(a) would have been permissible notwithstanding the provisions of 1 V.S.A. § 214(b) (2). Thus the trial court erred in its conclusion that the juvenile court could have retained jurisdiction over the defendant only until his eighteenth birthday. The superior court decided, as a matter of law, that the juvenile court could not possibly retain jurisdiction over the defendant until he turned twenty-one. It thereby failed, in ruling on defendant's motion to transfer, to exercise any discretion concerning the juvenile court's authority to retain jurisdiction over the defendant until the age of twenty-one. See *State* v. *Patch,* 145 Vt. 344, 353–54, 488 A.2d 755, 761 (1985) (refusal, as a matter of law, to submit written charges to the jury constituted a failure to exercise discretion; held, no prejudice). Failure to

exercise discretion, when discretion is called for, constitutes an abuse of discretion. *Id.* at 353, 488 A.2d at 761 (citing *State v. Savo, supra,* 141 Vt. at 208, 446 A.2d at 789).

■ However, an abuse of discretion by a trial court, in and of itself, is insufficient to require reversal upon appeal. Reversal of a conviction or a ruling by the trial court for an abuse of discretion is not required where the complaining party has failed to demonstrate prejudice. *State* v. *Wetherby,* 142 Vt. 248, 250, 453 A.2d 1124, 1125 (1982); V.R.Cr.P. 52(a); see also *Miller* v. *Ladd,* 140 Vt. 293, 297, 437 A.2d 1105, 1108 (1981) (in a civil case, we stated that "[i]n order for the plaintiffs to secure a reversal they must show that there has been an abuse of discretion and that prejudice flowed from that abuse"). As we have previously stated in a case concerning evidentiary questions, "the burden of showing prejudicial error rests clearly on [the] defendant." *Picknell, supra,* 142 Vt. at 230, 454 A.2d at 718 (citation omitted).

The trial court's refusal to grant the defendant's motion to transfer was based upon an analysis of the criteria set out in *Kent* v. *United States,* 383 U.S. 541, 566–67 (1966), as applied by the Supreme Court of New Hampshire in *State* v. *Smagula,* 117 N.H. 663, 668, 377 A.2d 608, 611 (1977). In *Smagula,* the New Hampshire Supreme Court specifically adopted the *Kent* criteria for use in evaluating motions to transfer cases to juvenile court. 117 N.H. at 667, 377 A.2d at 610–11. In *Jacobs,* we declined to mandate use of the *Kent* standards in evaluating motions under 33 V.S.A. § 635(b). 144 Vt. at 74, 472 A.2d at 1249. However, although not required, it was permissible for the court below to have used the *Kent* standards in deciding defendant's motion to transfer.

The *Kent* criteria applied by the court below follow:

1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.

2. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner.

3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons, especially if personal injury resulted.

4. The prosecutive merit of the complaint, i.e., whether

there is evidence upon which a Grand Jury may be expected to return an indictment (to be determined by consultation with the [prosecuting] attorney).

5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime . . . .

6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.

7. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division, other law enforcement agencies, juvenile courts and other jurisdictions, prior periods of probation to this Court, or prior commitments to juvenile institutions.

8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court.

Citing *Kent, supra,* 383 U.S. at 566–67.

In the trial court's findings and conclusions of law, in support of its denial of the defendant's motion to transfer, it cited two reasons for denying the defendant's motion. The *first reason* concerned the nature of the offense and the manner in which it was committed. The trial court noted that the criminal court would be better able to provide for the protection of the community. "The community is entitled to protection and an adult criminal court is better able to provide it. . . . [N]o evidence was presented to suggest that the Defendant did not have the sophistication and maturity to understand the nature and quality of the act of killing another human being." The *second reason* set forth by the trial court was that the juvenile court could not possibly assure rehabilitation of the defendant by the time he reached his eighteenth birthday. "Because the Juvenile Court would lose jurisdiction over the defendant in less than two years, the Juvenile Court could not possibly assure rehabilitation commensurate with the serious nature of the crime alleged and the Defendant's learning disabilities."

The trial court went on specifically to counter each of the

objections which the defendant raised to its denial of his motion to transfer his case from superior court to juvenile court:

> First, he claims the programs available to the Department of Corrections for 16 year olds are neither individualized nor sufficiently intense. Secondly, he contends he would be adversely affected by older adults in the prison population, and thirdly, he asserts he would suffer from the stigma of adult incarceration. Defendant's first point simply is not true. The evidence amply demonstrates that a wider range of rehabilitative programs are available to the Department of Corrections [than] the Department of Social and Rehabilitative [sic] Services. On the second point, the evidence demonstrates that the Department of Corrections has the capability of insulating young people from older inmates when circumstances require it. On the last point, the Defendant has not convinced us that he should be protected from the stigma of incarceration if in fact he committed the crime of First Degree Murder.

Taken together, the trial court's two reasons, as stated above, and its rebuttal of the defendant's objections, constitute the trial court's bases for its retention of criminal jurisdiction over the defendant's case.

 We have held that "[d]iscretionary rulings are not subject to review if there is a reasonable basis for the court's action." *State* v. *Savo, supra,* 141 Vt. at 208, 446 A.2d at 789 (admission of prior convictions in criminal trial) ; see also *State* v. *Ahearn,* 137 Vt. 253, 267, 403 A.2d 696, 705 (1979) (motion for continuance). Although defendant would have us de-emphasize the trial court's reliance on *Kent* criteria one through three, in favor of a greater reliance on factors six through eight, we feel that there were reasonable bases for the decision to deny the motion to transfer. There are adequate and reasonable bases set forth in the findings and conclusions of law to uphold the trial court's denial of the motion to transfer to juvenile court, even though the trial court erroneously concluded that the juvenile court could have retained jurisdiction over the defendant only until the age of eighteen.

 The *first reason* given by the trial court for denying the motion to transfer (the nature of the offense and the man-

ner· in which it was committed) was not related to the length of time the juvenile court could have retained jurisdiction over the defendant. Similarly, the reasons stated by the court for rejecting the defendant's objections to retention of jurisdiction by the criminal court were unaffected by the length of time the juvenile court could have retained jurisdiction over the defendant. These conclusions of law, adequately supported by its findings of fact, form reasonable bases for the trial court's decision to deny the defendant's motion to transfer. The *second reason* given by the trial court for denying the motion to transfer (which erroneously assumed an eighteen-year-old jurisdictional limitation, for juvenile court, over the defendant) was unnecessary to adequately support that decision. The defendant has failed to carry his burden to show that there were not reasonable bases for the discretionary decision of the trial court, and therefore, that the error of the trial court concerning the extent of the juvenile court's possible jurisdiction over the defendant was prejudicial. He has therefore been unable to demonstrate reversible error on this issue. *State* v. *Wetherby, supra,* 142 Vt. at 250, 453 A.2d at 1125.

## II.

Defendant next argues that the trial court erred in refusing to suppress evidence derived from the defendant. The trial court's denial of the motion to suppress was based on the ground that failure to give the *Miranda* warnings was excused by an "emergency rescue" exception to the exclusionary rule. *People* v. *Modesto,* 62 Cal. 2d 436, 446–47, 398 P.2d 753, 759, 42 Cal. Rptr. 417, 423 (1965), *later appeal,* 66 Cal. 2d 695, 427 P.2d 788, 59 Cal. Rptr. 124, *cert. denied,* 389 U.S. 1009 (1967). Based upon the facts stated at the outset of the opinion, the trial court concluded that the defendant was in police custody when Corporal Rivard asked the defendant if he wanted to show them where the body was. Presumably, therefore, the statement of rights required by the United States Supreme Court in *Miranda* v. *Arizona,* 384 U.S. 436 (1966), should have been given before that question was asked. Nevertheless, the trial court did not suppress the evidence of defendant's conduct in leading the police to the body; its opinion noted that the "purpose in asking Defendant to lead the officers to the

victim was not to build the evidence against Wade Willis; it was to rescue Terri Weed."

We take this opportunity to review the law applicable to the issue of custody. The United States Supreme Court's landmark decision in *Miranda* dealt with "incommunicado interrogation of individuals in a police-dominated atmosphere." 384 U.S. at 445. The Court in *Miranda* was especially concerned about the psychologically coercive surroundings of interrogation in private. *Id.* at 448–49, 457–58. The Court thought it "obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner." *Id.* at 457. To ensure that statements made under these circumstances were not compelled in violation of the Fifth Amendment to the United States Constitution, certain procedural safeguards were to be required prior to "custodial interrogation." The Court held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Id.* at 478.

In *Beckwith* v. *United States,* 425 U.S. 341, 347 (1976), the Court held that investigatory focus on a suspect is not sufficient to require the *Miranda* warnings. Less than a year after *Beckwith,* the Court decided *Oregon* v. *Mathiason,* 429 U.S. 492 (1977). Although not articulating a specific test for evaluating questions of *Miranda* custody, the Court elaborated as follows:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Id.* at 495 (emphasis in original).

In *California* v. *Beheler*, 463 U.S. 1121 (1983), the Court discussed the custody question and noted that "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the decree associated with a formal arrest." 463 U.S. at 1125 (quoting *Mathiason, supra,* 429 U.S. at 495). Finally, in July of 1984, the United States Supreme Court articulated a test for determining when a suspect is in custody for *Miranda* purposes.

> Although Trooper Williams apparently decided as soon as respondent stepped out of his car that respondent would be taken into custody and charged with a traffic offense, Williams never communicated his intention to respondent. A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; *the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.*

*Berkemer* v. *McCarty*, — U.S. —, —, 104 S. Ct. 3138, 3152 (1984) (emphasis added) (footnote omitted, citing *People* v. *P.*, 21 N.Y.2d 1, 9–10, 233 N.E.2d 255, 260, 286 N.Y.S.2d 225, 233 (1967) (an objective, reasonable-man test is appropriate because, unlike a subjective test, it "is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies [sic] of every person whom they question")). In conducting this objective inquiry, the Court will look for "the functional equivalent of formal arrest." *Berkemer, supra,* — U.S. at —, 104 S. Ct. at 3152.

It is evident that the United States Supreme Court has focused largely on the coercive nature of the physical setting of police questioning and has declined to inquire into the subjective beliefs of either the suspect or the police. The Court seems to conduct an intensive factual inquiry into the objective circumstances present during police questioning. More important to our inquiry here, the Court has been niggardly in expanding the requirement of giving *Miranda* warnings from the incommunicado, police-dominated situation of *Miranda* itself.

Several federal and state courts as well have used objective tests for evaluating *Miranda* custody and have developed helpful factors to apply to specific factual situations. *United States*

v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981) ; State v. Cruz-Mata, 138 Ariz. 370, 373, 674 P.2d 1368, 1371 (1983) ; State v. Melemai, 64 Hawaii 479, 481, 643 P.2d 541, 544 (1982) ; State v. Bleyl, 435 A.2d 1349, 1358 (Me. 1981) ; and Whitfield v. State, 287 Md. 124, 141, 411 A.2d 415, 425, cert. dismissed, 446 U.S. 993 (1980).

In the instant case, the trial court quoted the following language from our decision in State v. Hohman, 136 Vt. 341, 349, 392 A.2d 935, 940 (1978) :

> [T]he determination of custody must focus on the compulsive aspect of the custodial interrogation. The key question is whether the defendant could reasonably have believed he was not free to leave. The strength or the content of police suspicion or the degree of investigative focus on the defendant is relevant only to the extent that either contributed to the defendant's reasonable belief that he could not leave. The giving of the Miranda warnings at the outset does not conclusively determine the existence of custody nor does the absence of restraints such as handcuffs necessarily determine the lack of it.

(Citations omitted.) The trial court then erroneously proceeded to determine that the officers could reasonably believe that the defendant could have committed a killing; it considered this tantamount to the defendant not being free to leave. This, of course, would merely go to the strength of the police suspicion or the focus of their investigation on the defendant. Under Beckwith, supra, 425 U.S. at 345, 347, this is not determinative of custody, and, therefore, the trial court was in error. We must therefore proceed to reexamine whether the defendant was in custody at the time of questioning.

 Hohman purports to be "an objective test based on the totality of circumstances in each particular case." 136 Vt. at 349, 392 A.2d at 940 (citations omitted). This language was recently reiterated in State v. Picknell, supra, 142 Vt. at 222, 454 A.2d at 714. Picknell did not repeat the confusing language in Hohman: "whether the defendant could reasonably have believed he was not free to leave." Hohman, supra, 136 Vt. at 349, 392 A.2d at 940. Because of the potentially confusing interpretation that it is permissible to inquire into the subjective state

of the defendant's mind, we abandon the above language in *Hohman*. As we stated in *Picknell, supra,* 142 Vt. at 222, 454 A.2d at 714, whether a defendant is in custody for *Miranda* purposes is an objective inquiry based on the totality of circumstances. This is also consistent with the United States Supreme Court's recent *Berkemer* decision. Inquiring into the subjective thoughts of either the police or the defendant is likely to pervert the factfinding process in a *Miranda* hearing, and such inquiry has been rejected by the United States Supreme Court. *Berkemer, supra,* — U.S. at —, 104 S. Ct. at 3152.

Henceforth, in determining when a suspect "has been taken into custody or otherwise deprived of his freedom of action in any significant way," *Miranda, supra,* 384 U.S. at 444, our courts should make an objective inquiry into the totality of the circumstances to determine if a reasonable person would believe he or she were free to leave or to refuse to answer police questioning. A brief detention or *Terry* stop (*Terry* v. *Ohio,* 392 U.S. 1 (1968)), however, does not require *Miranda* warnings. *Berkemer, supra,* — U.S. at —, 104 S. Ct. at 3150–51. Trial courts should be mindful of situations approximating "incommunicado interrogation of individuals in a police-dominated atmosphere," *Miranda, supra,* 384 U.S. at 445, or the "functional equivalent of formal arrest." *Berkemer, supra,* — U.S. at —, 104 S. Ct. at 3152. Also, because *Miranda* custody hearings present questions of federal law, see *Malloy* v. *Hogan,* 378 U.S. 1, 8 (1964) (making Fifth Amendment's protection against compelled self-incrimination applicable to the states), we are bound to apply federal law, and to pay careful attention to the decisions of the United States Supreme Court when determining what constitutes custodial interrogation. "On federal issues, we are no more than an intermediate court, attempting to apply the 'supreme law of the land,' as pronounced by the United States Supreme Court. Supreme Court authority over our federal rulings is absolute." *State* v. *Badger,* 141 Vt. 430, 448, 450 A.2d 336, 346 (1982) (quoting *Cooper* v. *Aaron,* 358 U.S. 1, 18 (1958)).[4]

---

[4] We note that the defendant did not raise below the applicability of the Vermont Constitution, ch. I, art. 10, as to whether the defendant was in custody at the time of the initial question by the police. As this issue

The relevant facts of the instant case disclose that the state police were summoned to the Willis residence with some suspicion that a homicide had occurred. Upon their arrival, the police entered the Willis' kitchen where Mr. Willis and Mr. and Mrs. Bullis were present. Mr. Willis told the officers that Wade "told me he killed some girl," whom Mr. Willis identified as Terri Weed. Mr. Willis said the body was out behind Larry Weed's residence. When one officer asked where Wade was, Wade entered the kitchen from the living room. He said nothing and no questions were asked of him. At some point after this, the two police officers, the defendant, Mr. Willis and Roy Bullis all went outside. One officer made a radio call from his police cruiser to the police barracks. The other officer then said to the defendant, "You want to show us where it is?" The defendant nodded affirmatively.

Thus, the defendant was questioned outside of his house at about 4:30 on the afternoon of May 21, 1981. The defendant was never specifically summoned for questioning, but walked into the officers' presence. The defendant was asked only one simple question, phrased in a nonthreatening way. The defendant was just outside of his own home in the presence of his father, his uncle and two state police. There was no discernible pressure or restraint of any sort on the defendant, and the questioning lasted only seconds. He was apparently questioned as a suspect. Application of these factors to the facts clearly indicates that there was nothing approaching "incommunicado interrogation of [the defendant] in a police-dominated atmosphere," *Miranda, supra,* 384 U.S. at 445, or the "functional equivalent of formal arrest." *Berkemer, supra,* — U.S. at —, 104 S. Ct. at 3152. The Court in *Miranda* further noted that custodial interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. No such compelling pressures were present here, and the trial court erred in determining the defendant to have been in custody.

Although the trial court refused to suppress the

was neither briefed nor argued by the defendant, we decline to address the custodial question in relation to the Vermont Constitution.

evidence procured after questioning the defendant, albeit upon the application of the "emergency rescue" exception, we are able to affirm the result reached below. A trial court may achieve the correct results for the wrong reasons. *State* v. *Patnaude*, 140 Vt. 361, 377, 438 A.2d 402, 409 (1981). There was no reversible error in this regard. In view of our finding that the defendant was not in custody and that *Miranda* warnings therefore were not required, we decline to rule on the applicability of the "emergency rescue" exception in this jurisdiction.

## III.

Defendant's next two claims of error involve events during trial to which no objections were made below. He asks this Court to notice these claims under our plain error rule, V.R.Cr.P. 52(b).

## A.

Defendant first claims that it was plain error for the trial court to have accepted the waiver by the defendant and his guardian of what he describes as the psychiatrist-patient privilege provided for in 13 V.S.A. § 4816(c).

To impeach the opinion testimony of the State's psychiatrist and the manner in which he conducted an interview with the defendant to determine his sanity at the time of the alleged offense, defendant's attorney began his cross-examination of the psychiatrist using questions and answers from the transcript of the taped interview between the psychiatrist and the defendant.

The deputy attorney general interrupted the examination and asked for a bench conference. At the bench he advised the court, "This is dangerous." The court took an immediate recess and in chambers, in the presence of counsel, the defendant and his guardian, the deputy attorney general noted on the record: "As the court is aware, we are entering a very dangerous area. Mr. Kilmartin, through his question, has elicited an answer which goes in and invades the doctor-patient privilege. . . . I believe therefore it is my right to pursue this." The state's attorney interjected: "what we are asking for is a waiver from the guardian and Wade to pursue it." The attorney for the defendant indicated that he only wanted to use the interview material to impeach the opinion of the State's psy-

chiatrist, but that he could not enter a waiver on behalf of a minor.

The statutory "privilege" or prohibition that both the State and the defendant were referring to is set forth in 13 V.S.A. § 4816(c) as follows:

No statement made in the course of the examination by the person examined, whether or not he has consented to the examination, shall be admitted as evidence in any criminal proceeding for the purpose of proving the commission of a criminal offense or for the purpose of impeaching testimony of the person examined.

Since the defendant's attorney was offering the questions posed by the psychiatrist, and the defendant's responses to them, for the purpose of impeaching the opinion testimony of the psychiatrist and the manner in which he conducted the interview, defendant's attorney contended the cross-examination was proper. However, he insisted it would be improper for the State on redirect to breach the statutory prohibition of 13 V.S.A. § 4816(c), and that the court should not permit the testimony of the psychiatrist to go to the jury without a limiting instruction to the effect that the questions and answers elicited during the psychiatrist-patient interview must not be considered by it as evidence of defendant's commission of the offense.

The trial court's response to this was:

If you want to get involved in this area, let's get a waiver of the statutory protection and if not, I think we will cut it off here and not go further with it.

The court then gave defense counsel time to go confer with the defendant and his guardian concerning waiver of the privilege.

When the recess was over the parties reassembled in chambers and before the court could say anything the guardian spoke up: "We waive it. There hasn't been any question from the start away back in jury selection, of the question who done it."

Whereupon the following colloquy took place between the court, the guardian and the defendant:

| | |
|---|---|
| The Court: | Mr. Willis, you have read the Statute 4816(c) of Title XIII that applies to the right of the defendant not to have that information disclosed to help prove the commission of the offense.<br>And, knowing that, have you discussed it with Wade? |
| The Guardian: | Yes, I have. |
| The Court: | Is it your desire to waive that provision? |
| The Guardian: | Yes. |
| The Court: | Or any doctor-patient privilege that may exist?[5] |
| The Guardian: | Yes. |
| The Court: | Wade, do you agree with the guardian in that respect? |
| The Defendant: | Yes. |

Defendant's attorney then proceeded with the cross-examination of the State's psychiatrist, and each referred from time to time to the transcript of the taped interview between the psychiatrist and the defendant. The court did not thereafter restrict the State in its redirect examination of the psychiatrist or give the limiting instruction to the jury which the defendant requested. Defendant did not object.

In addressing claims of plain error on the part of the trial court, we look to the applicable criminal rule for guidance. V.R.Cr.P. 52(b) provides as follows:

> Plain errors or defects *affecting substantial rights* may be noticed although they were not brought to the attention of the court. (Emphasis added.)

The Reporter's Notes explain that "Rule 52(b) states the general proposition that an appellate court will notice errors not

---

[5] Court was referring to 12 V.S.A. § 1612(a) (Supp. 1984) which provides:

> Unless the patient waives the privilege or unless the privilege is waived by an express provision of law, . . . a mental health professional . . . shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity.

properly raised before it *if they are obvious and affect the fair administration of justice or a defendant's constitutional rights.* Exercise of the power is exceptional . . . ." (Emphasis added.) In a pre-Criminal Rules case, we observed that:

> In order to reach the question attempted to be raised we must first decide whether this is one of those rare and extraordinary cases where a glaring error occurred during the trial and was so grave and serious that it *strikes at the very heart of the respondent's constitutional rights*. It is only in this context that we will examine the case and determine whether the record indicates it is of this character since the question is not otherwise properly before this court.

*State* v. *Morrill*, 127 Vt. 506, 511, 253 A.2d 142, 145 (1969) (emphasis added).

 In the present case, the defendant's first claim of plain error concerns whether he knowingly and intelligently waived his constitutional right against self-incrimination and his statutory psychiatrist-patient privilege. However, given the facts of the present case, we cannot find that the first claimed error could form a "reasonable basis for a fear that injustice has been done." *State* v. *Welch*, 136 Vt. 442, 445, 394 A.2d 1115, 1116 (1978). "The basic rights of defendants in the criminal process certainly must be protected, but that protection cannot be extended to unprofessional and irresponsible manipulation." *State* v. *Durling*, 140 Vt. 491, 497, 442 A.2d 455, 458 (1981). Indeed, the introduction of the complained-of evidence by the defense approaches what has been termed "invited error." *State* v. *Mosher*, 143 Vt. 197, 206, 465 A.2d 261, 266 (1983). Furthermore, where the discussions concerning the defense decision to waive the defendant's privileges took place off the record, there is scant evidence to show that the waiver was neither intelligent nor knowing, or that the defense was induced, by an allegedly erroneous interpretation of 13 V.S.A. § 4816(c), to mistakenly waive the defendant's privileges. See *State* v. *Kasper*, 137 Vt. 184, 193, 404 A.2d 85, 91 (1979) (the alleged error must be obvious or manifest).

## B.

Defendant's second claim of plain error is that the trial

court erroneously permitted the State's psychiatrist to express his opinion as to the defendant's sanity in legal rather than in medical terms.

The record amply demonstrates that the State psychiatrist, who also has a subspecialty in forensic psychiatry, was aware that it was the jury's province to determine from all the evidence, including lay witness testimony and expert opinion testimony, whether the defendant was legally sane or insane at the time of the alleged offense.

In layman's language he explained that in his opinion the defendant was not suffering from any mental disease or defect; that although immature for a 16 year old, he was not mentally retarded; that the defendant had the capacity to appreciate right from wrong, and the ability to conform his conduct to the requirements of the law. He also was of the opinion that the defendant had the capability to plan and carry out a killing of another individual.

This second claim of plain error does not allege the violation of any primary constitutional right. Neither does it form a reasonable basis for alleged injustice, nor is it clear that the form of the psychiatrist's opinion testimony was improper. See *State v. Norton*, 134 Vt. 100, 104, 353 A.2d 324, 326 (1976) ("testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact") ; accord *Cadel v. Sherburne Corp.*, 139 Vt. 134, 136–37, 425 A.2d 546, 547–48 (1980) (citing proposed, and now promulgated, V.R.E. 704).

Since we find no plain error in these two claims, and since the issues were not raised before the trial court, we decline to address these arguments further on appeal.

## IV.

The final issue briefed by defendant challenges the participation of the assistant judges in hearing and deciding the defendant's motion to transfer his case to juvenile court, and his motion to suppress certain evidence, both of which he asserts involved mixed questions of law and fact. Defendant also challenges the participation of the assistant judges in rejecting a plea agreement proffered by the defendant and the State.

 Defendant admits that objections concerning the alleged improper participation of the assistant judges were never raised below. Normally, any error not brought to the attention of the court below is considered waived and it may not be raised for the first time in this Court. *State* v. *Wood*, 143 Vt. 408, 412, 465 A.2d 1372, 1374 (1983). Exceptions to this general rule are claims of error raised for the first time on appeal to this Court based upon a lack of subject matter jurisdiction, *Soucy* v. *Soucy Motors, Inc.*, 143 Vt. 615, 617, 471 A.2d 224, 225 (1983), or where errors constitute "plain error" under V.R.Cr.P. 52(b). *State v. Moran*, 141 Vt. 10, 20, 444 A.2d 879, 884 (1982).

## A.

Defendant initially bases his challenge on the claim that the trial court, composed of two assistant judges and a presiding judge, lacked subject matter jurisdiction to consider the two above motions and the plea bargain agreement. Specifically, defendant claims that the assistant judges improperly participated in the application of law to agreed-upon facts (found in connection with two motions) and in the exercise of judicial discretion (in rejecting the plea bargain agreement).

Our jurisdictional ruling in *Soucy, supra,* relied upon by defendant, was based upon a statutory provision,[6] since amended, which divested any trial court with participating assistant judges of subject matter jurisdiction immediately upon the introduction of an issue sounding in equity. *Soucy, supra,* 143 Vt. at 617–18, 471 A.2d at 225–26. But see *Vermont National Bank* v. *Dowrick*, 144 Vt. 504, 509, 481 A.2d 396, 399 (1984) (critical time for determining equitable jurisdiction was at the time of trial). Thus in *Soucy* and like cases initially sounding in equity, a court composed of assistant judges in addition to the presiding judge was without proper jurisdiction at the very outset. *Soucy, supra,* 143 Vt. at 620, 471 A.2d at 227.

---

[6] 4 V.S.A. § 219, which provided at the time of the trial in *Soucy, supra:*

> All rights and duties of a chancellor shall vest exclusively in the presiding judges of the superior court and the powers and jurisdiction of the courts that were heretofore vested in the courts of chancery shall vest in the superior court. District and probate judges shall have the powers of a chancellor in passing upon all civil matters which may come before them.

The situation in a criminal action is distinguishable; indeed, it is fundamentally different. At the time *Soucy, supra,* was decided, there were statutory provisions specifically divesting trial courts, constituted with assistant judges, of jurisdiction in equity cases. There was, and is, no such statutory provision limiting the jurisdiction of a trial court, constituted with assistant judges, at the outset of a criminal proceeding.[7] We also note that V.R.Cr.P. 54(c) (1) (ii) clearly states that a court composed of assistant judges and a presiding judge may properly sit in criminal cases which involve questions of fact, of law, and mixed questions of law and fact. Therefore, contrary to the situation in *Soucy, supra,* concerning the initial jurisdiction of a court composed of assistant judges and a presiding judge in cases sounding in equity, the mere participation of assistant judges in criminal cases which involve legal questions, questions of mixed law and fact, or by extension, questions calling for the exercise of judicial discretion, does not initially deprive a superior court of its statutory jurisdiction to hear the case.

Since we find that the court initially had proper jurisdiction when these issues were considered at trial, we now proceed to determine if the participation of assistant judges could have had any effect on the court's subject matter jurisdiction. Defendant's reliance upon *State* v. *Dunkerley,* 134 Vt. 523, 365 A.2d 131 (1976), to support his claim that the court in the instant case exceeded its jurisdictional limits, is misplaced. We held in *Dunkerley* that assistant judges sitting in criminal cases could not participate in decisions involving pure questions of law. *Id.* at 526, 365 A.2d at 132. Our decision in *Dunkerley* was not, however, based upon a lack of jurisdiction of a court composed of assistant judges and a presiding judge, proceeding together, to decide a question of law. Rather, the basis of our decision in that case was a lack of due process and

---

[7] Title 4 V.S.A. § 114 (Supp. 1981) conferred jurisdiction over criminal offenses upon superior courts. Similarly, at the time of the trial below, 4 V.S.A. § 111(a) (Supp. 1981) stated that superior courts would consist of a presiding judge and one or two assistant judges, if available. Therefore, assistant judges had, by law, explicit statutory authority to participate in criminal proceedings, subject to statutory or constitutional limitations imposed elsewhere.

of the right to representation by a legally qualified attorney. *Id.* While the participation of assistant judges in decisions involving questions of pure law, or the application of law to findings of fact, would be improper, the basis for this fatal flaw would be a deprivation of constitutional due process and the right to counsel. *Id.* Such a court would not lack *jurisdiction* to reach those questions.

■ For the reasons cited above, we hold that any error of the assistant judges in improperly participating in deciding mixed questions of law and fact or exercising judicial discretion would not have had any effect on the trial court's subject matter jurisdiction. Therefore, any such alleged error, raised in the first instance upon appeal to this Court on the basis of jurisdictional defects, is unavailing.

## B.

Defendant also appears to challenge the composition of the trial court on constitutional grounds (violation of defendant's rights to due process and to effective assistance of counsel). Because these objections were not raised below, any errors may be noticed upon appeal only if they constitute "plain error."

■ Under the plain error analysis stated in Part III of this opinion, we do not find that the alleged impropriety of the assistant judges in participating in the motions to transfer and to suppress reaches the level of plain error. As stated above, one test that we have applied is that plain error must be obvious or manifest from the record. Defendant's allegations of improper participation of the assistant judges are based solely upon evidence of the fact that signatures of the assistant judges appear, along with that of the presiding judge, beneath the orders disposing of each of the two motions.[8] While it is possible that the assistant judges may have improperly participated, this evidence alone is insufficient to warrant such a conclusion. Indeed their signatures are equally probative of the fact that they properly carried out their functions with regard to findings of fact. This lack of evidence concerning alleged

---

[8] The order disposing of each of these motions is preceded by findings of fact and conclusions of law.

improper conduct by the assistant judges precludes this Court from considering such participation as "plain error."

Because defendant's allegations of improper participation of the assistant judges in the court's rulings on the motions to transfer and to suppress were not properly raised in the court below and are not "plain error," this Court will not address the merits of those claims.

The defendant also challenges, on constitutional grounds, the trial court's rejection of the plea agreement. Even if we assume, arguendo, that this alleged error constitutes "plain error," the claim would fail on its merits. Our holding in *State* v. *Hunt*, 145 Vt. 34, 49, 485 A.2d 109, 117, *cert. denied,* — U.S. —, 105 S. Ct. 153 (1984), that the participation of assistant judges in the rejection of a plea agreement does not violate a defendant's constitutional rights to effective assistance of counsel and due process of law, would be controlling in the present case.

*Affirmed.*