## State of Vermont v. James C. Oney

[989 A.2d 995]

No. 07-367

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed November 25, 2009

*James P. Mongeon*, Rutland County State's Attorney, Rutland, and *Jane Woodruff*, Executive Director, State's Attorneys and Sheriffs Department, Montpelier, for Plaintiff-Appellee.

*Allison N. Fulcher* and *Matthew Keister*, Law Clerk, of *Martin & Associates*, Barre, for Defendant-Appellant.

¶ 1. **Dooley, J.** Defendant appeals the Rutland District Court's denial of his motion to suppress statements made at a police interview, arguing that the police violated his rights under the Fifth and Sixth Amendments to the United States Constitution, and Chapter I, Article 10 of the Vermont Constitution. The trial court found that defendant was not in custody at the time the incriminating statements were made and denied defendant's motion. We affirm.

¶ 2. The material facts are not in dispute. In July 2006, defendant became a person of interest in a series of fires in the Rutland area. On July 26, the night three of these fires were set, a police officer approached defendant at a local convenience store and asked if he could have a word with him outside. Defendant agreed. The officer asked defendant about the fires, and defendant denied setting them. The officer told defendant that he was not under arrest and asked if he would voluntarily accompany the officer to the police department. Again, defendant agreed. The officer loaded defendant's bicycle into the police car and drove defendant, who sat in the front seat of the car, to the department. Defendant, unrestrained, entered the department through a nonpublic door.

¶ 3. Two police sergeants spoke with defendant in an interview room at the police department. They did not give *Miranda* warnings to defendant at any point in the interview. They closed the interview room door, but did not lock it. They did not restrain defendant during the interview, nor did they obstruct his access to the door. At the start of the conversation, both sergeants emphasized that defendant was there on his own free will and that he was free to go at any time. Defendant acknowledged that he understood. One officer then addressed the three fires that occurred that night, telling defendant that he had been seen

leaving the scene of the second fire and in the area of the third. Defendant thereafter admitted to setting these three fires. During this portion of the conversation, one of the sergeants starting videotaping the interview.

¶ 4. After defendant's confession to these fires, an officer told defendant, "I want to talk to you for a little while longer." The officer immediately began discussing other recent fires in the Rutland area, stating that they had evidence that tied defendant to many, but not all, of these other fires. Subsequent to this shift in the conversation, defendant again affirmed that he came to the station of his own free will, and that he had been told that he was free to leave at any time. At 11:29 p.m., defendant stated, "I still think I should have a lawyer here." One of the officers responded, "Are you asking for a lawyer or do you want to still talk about this — because to me you're not sure." Defendant did not respond to this question and the interview continued. The officer told defendant that the police had surveillance tapes of several of the earlier fires. Subsequently, amid denying his involvement in numerous other fires, defendant admitted to setting three additional blazes. At 12:15 a.m., defendant stated that he would like to leave, and one of the sergeants prevented his departure by stating, "We're not done yet." Up until that point, the officers had given defendant repeated assurances that he was free to leave. Although defendant's departure was delayed, defendant was soon thereafter given a citation and told he was free to go.

¶ 5. Defendant was later charged with six counts of arson of various degrees under 13 V.S.A. §§ 503-505. The first three counts were for the three fires on July 26, 2006. The fourth count was for a dumpster fire at a restaurant on June 28, the fifth for burning a building on May 12, and the sixth for a dumpster fire at the Rutland Middle School on April 25. Counts two and three were for attempted arson and were misdemeanor charges; the others were felonies.

¶ 6. Arguing that his constitutional rights to not incriminate himself and to the advice of an attorney had been violated, defendant moved in the trial court to suppress his statements to the police. The trial court determined that defendant was deprived of his freedom of action at 12:15 a.m., when defendant stated a desire to leave and the police responded that they were not done yet. The trial court ruled that all of defendant's statements made before 12:15 a.m. were admissible, and it suppressed the subsequent statements.

¶ 7. Defendant then entered into a plea agreement, reserving his right to appeal his convictions on counts four, five, and six, which correspond to the incriminating statements made between 11:29 p.m. and 12:15 a.m.

■ ¶ 8. On appeal, defendant argues that after he confessed to the first three fires, he was then in custody, and since no *Miranda* warnings were given, his subsequent confessions are inadmissible. Defendant also argues that his statement at 11:29 p.m. constituted a request to speak with an attorney and that the officers' failure to honor his request violated his Fifth and Sixth Amendment rights to counsel.[1]

■ ■ ¶ 9. We first address defendant's arguments that his Fifth Amendment rights, as specified in *Miranda v. Arizona*, 384 U.S. 436 (1966), were violated.[2] This discussion encompasses both of defendant's arguments that his confessions are inadmissible because they were given without *Miranda* warnings and because he invoked his right to counsel.[3] The key inquiry for the resolution of both issues is whether defendant was in custody at the time of the confession. See *State v. Pontbriand*, 2005 VT 20, ¶ 10, 178 Vt. 120, 878 A.2d 227 ("Under *Miranda*, as currently applied, the police must stop questioning a suspect who is in custody after he or she

[1] Defendant also argues that his right to counsel under Chapter I, Article 10 of the Vermont Constitution was violated. As we have held that "the Article 10 privilege against self-incrimination and that contained in the Fifth Amendment are synonymous," *State v. Rheaume*, 2004 VT 35, ¶ 18, 176 Vt. 413, 853 A.2d 1259; see also *State v. Peterson*, 2007 VT 24, ¶¶ 17-18, 181 Vt. 436, 923 A.2d 585, and that "the right to representation by counsel found in Chapter I, Article 10 of the Vermont Constitution confers a right similar to the federal Sixth Amendment right," *State v. Porter*, 164 Vt. 515, 518, 671 A.2d 1280, 1282 (1996), we need not separately address this argument.

[2] Defendant states in his brief that the issue of *Miranda* rights was not raised below and that this is therefore a plain error appeal in which defendant must demonstrate a "miscarriage of justice" or an "error so grave and serious that it strikes at the very heart of the defendant's constitutional rights." *State v. Beaudoin*, 2008 VT 133, ¶ 14, 185 Vt. 164, 970 A.2d 39 (quotations omitted). While the *Miranda* question was not raised in defendant's written motion to suppress, it was raised in his oral argument to the trial court. Accordingly, we do not apply the limited plain error standard of review.

[3] While the text of the Fifth Amendment does not contain a right to counsel, the United States Supreme Court in *Miranda* "established a number of prophylactic rights designed to counteract the 'inherently compelling pressures' of custodial interrogation, including the right to have counsel present." *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991) (quoting *Miranda*, 384 U.S. at 467).

requests an attorney. No such requirement exists, however, for suspects who are not in custody." (citations omitted)); *State v. Garbutt*, 173 Vt. 277, 282, 790 A.2d 444, 448 (2001) ("Suspects not in custody are not entitled to *Miranda* warnings.").

¶ 10. Whether a suspect is in custody requires "an objective inquiry into the totality of the circumstances to determine if a reasonable person would believe he or she were free to leave or to refuse to answer police questioning." *State v. Willis*, 145 Vt. 459, 475, 494 A.2d 108, 117 (1985). The inquiry focuses on the "coercive nature of the physical setting of police questioning." *Id.* at 473, 494 A.2d at 116.

¶ 11. In reviewing a motion to suppress, we review the trial court's legal conclusions de novo and its findings of fact under a clearly erroneous standard. *Pontbriand*, 2005 VT 20, ¶ 12. "Therefore, the trial court's findings of fact regarding the course of the interview receive deference, but its ultimate legal determination that the totality of the circumstances would have led a reasonable person to believe that he or she was in custody is reviewed de novo." *Id.*

¶ 12. Defendant does not argue that he was in custody before 11:26 p.m.[4] He asserts that he was deprived of his freedom of action when the sergeant said, "I want to talk to you for a little while longer" and transitioned the conversation to earlier fires. He argues that a reasonable person in a small, windowless room at the police station, after having confessed to three crimes, would not believe that he was free to leave, despite the officer's statements to the contrary.

¶ 13. We affirm that defendant was not in custody when he made the incriminating statements, considering the trial court's uncontroverted factual findings regarding the circumstances of defendant's questioning. The court made the following findings of fact: (1) defendant voluntarily left the convenience store to talk with the police; (2) defendant voluntarily went to the station and interview room; (3) the police could not have made it any clearer to him that he was there voluntarily, that he was free to leave,

---

[4] Defendant did argue before the trial court that the entire police station interview was involuntary and that defendant was in custody throughout. In this appeal, he has abandoned his claim that his presence at the police station was involuntary, as well as his argument that he was in custody during the interview prior to 11:26 p.m.

and that he could leave; (4) defendant was not handcuffed and had free access to an unlocked door; and (5) there was "no evidence on the video or from any testimony that he was deprived of his freedom of action in a significant way" before 12:15 a.m. None of the findings are clearly erroneous,[5] and as such, we are bound by them. *Pontbriand*, 2005 VT 20, ¶ 12.[6]

¶ 14. We are not persuaded by defendant's claim that a reasonable person would believe that the police would prevent him from leaving after having confessed to three crimes. A noncustodial situation does not become custodial automatically because the interviewee has confessed to a crime. See, e.g., *United States v. Chee*, 514 F.3d 1106, 1114 (10th Cir. 2008)

---

[5] In fact, defendant does not argue that any of the findings regarding the circumstances of his interview are clearly erroneous.

[6] The dissent, in concluding that defendant was in police custody between 11:26 p.m. and 12:15 a.m., looks beyond the trial court's findings of fact and engages in appellate fact-finding. For instance, the dissent notes that the "nature and tone of the interview changed" during the period in question. *Post*, ¶ 21. Things like the "nature" and "tone" of the interview are factual determinations that are properly made by the trial court. They should not be determined de novo by this Court.

The dissent attempts to justify its de novo review of the trial court's factual findings by asserting that the issue of whether defendant was in police custody is a mixed question of law and fact and is therefore subject to independent review. See *post*, ¶¶ 28-30. As the United States Supreme Court has explained, in determining whether a suspect is in police custody, "[t]wo discrete inquiries are essential . . . : first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). As we noted in *Pontbriand*, the second inquiry is a mixed question of law and fact and is therefore appropriately subject to independent review. 2005 VT 20, ¶ 12. However, the former inquiry concerning the circumstances of the interrogation is a pure question of fact and as such is properly determined by the trial court. *Thompson*, 516 U.S. at 112. When the dissent, in an independent review of the videotaped interview, makes a determination as to the interview's tone, the dissent makes findings as to the "circumstances surrounding the interrogation." See *id.* Such a factual determination falls within the province of the trial court and can be reviewed by this Court only for clear error. See, e.g., *Kanaan v. Kanaan*, 163 Vt. 402, 405, 659 A.2d 128, 131 (1995); *Mullin v. Phelps*, 162 Vt. 250, 260, 647 A.2d 714, 720 (1994).

The dissent further contends that it is justified in appellate fact-finding because "the trial court made virtually no factual findings on the critical period of time at issue here." *Post*, ¶ 30. However, as we have previously stated, this Court will not engage in appellate fact-finding to remedy deficiencies in the trial court's findings. *N. Sec. Ins. Co. v. Perron*, 172 Vt. 204, 218 n.10, 777 A.2d 151, 161 n.10 (2001).

(holding that defendant was not in custody even after confessing to sexual assault). A confession is just one of the circumstances to consider in evaluating whether a reasonable person would believe he or she was free to leave. See *id.*; *Graham v. United States*, 950 A.2d 717, 730-31 (D.C. 2008); *State v. Champion*, 533 N.W.2d 40, 43 (Minn. 1995). We acknowledge that once a suspect confesses to committing a serious criminal act, this fact is significant in this evaluation. See, e.g., *State v. Pitts*, 936 So. 2d 1111, 1134 (Fla. Dist. Ct. App. 2006) (holding that suspect in custody after confessing to "serious crime"). However, the severity of the crime confessed to affects the weight we attribute to this factor. See *Graham*, 950 A.2d at 731 (concluding that a reasonable person would not have perceived himself under arrest after confessing to "only a misdemeanor offense"); *State v. Stringham*, 2003-Ohio-1100, ¶ 25 (Ct. App.) (unreported) (distinguishing confession to misdemeanor from that to felony for purposes of determining custody); *State v. Singleton*, Nos. 17003, 17004, 1999 WL 173357, at *6 (Ohio Ct. App. Mar. 31, 1999) ("We do not hold that a defendant who confesses to a crime at a police station is necessarily in custody immediately thereafter. Whether the defendant is thereafter in custody depends on the circumstances, particularly the crime confessed to.").

¶ 15. In this case, of the three crimes defendant initially admitted to, two were misdemeanors. While the third resulted in a felony charge, at the time of the interview, one sergeant told defendant that he believed any charge resulting from his confession would be a misdemeanor. For misdemeanors committed not in the presence of an officer, typically the police issue only a citation and do not arrest the suspect. See V.R.Cr.P. 3(c). In fact, after the interview was completed, defendant was issued a citation and left the police station. See, e.g., *Chee*, 514 F.3d at 1114 (considering fact that suspect freely left after police-station interrogation to be significant). Thus, mere confession to what defendant believed to be three misdemeanors would not necessarily lead a reasonable person in defendant's circumstances to believe that he was not free to leave. It is, however, one of the facts to consider in evaluating whether the interview was custodial.

¶ 16. Considering all the facts regarding the circumstances of defendant's interview, we conclude that a reasonable person would have believed he was free to leave, and, thus, defendant was not in custody. Custody is not established simply

because the questioning takes place in a police station or because the questioned person is one whom the police suspect. *Oregon v Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). While defendant had just confessed to three crimes that were believed to have been misdemeanors, the sergeants repeatedly told defendant that he was free to leave at any time, including after defendant's confession. As the trial court found, "[t]here's no evidence on the video or from any testimony that he was deprived of his freedom of action in a significant way. In fact, to the contrary, the police officers made it very clear that he was free to leave at any time." The questioning was not coercive, defendant was unrestrained and had free access to the unlocked door, and the officers repeatedly assured defendant that he was free to leave. See, e.g., *Burket v Commonwealth*, 450 S.E.2d 124, 128-30 (Va. 1994) (holding that defendant not in custody when he willingly went to police station upon officer's request and was advised that he was not under arrest and was free to leave at any time, even though defendant stated, "I'm gonna need a lawyer"). The statement, "I want to talk to you for a little while longer," did not require defendant to continue the conversation; it merely expressed the officer's request and did not negate all the other police statements that defendant was free to leave at any time. Because defendant was not in custody, the police were not obligated to inform him of his *Miranda* rights. *Garbutt*, 173 Vt. at 282, 790 A.2d at 448.

¶ 17. Because defendant was not in custody, there was also no violation of defendant's Fifth Amendment right to counsel. Thus, the police were not obligated to stop questioning defendant even if he unequivocally asked to speak with a lawyer. *Pontbriand*, 2005 VT 20, ¶ 20 ("Looking at the totality of the circumstances, the facts found by the trial court illustrate that [the defendant] was not in police custody during the interview, and we so hold. Accordingly, *Miranda* is inapplicable here, and the police were not obliged to stop questioning [the defendant] when he indicated he wished to speak with a lawyer.").

¶ 18. There was also no violation of defendant's Sixth Amendment right to counsel. The Sixth Amendment right to counsel attaches at the initiation of judicial criminal proceedings, whether the judicial proceedings have been initiated "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Brewer v Williams*, 430 U.S. 387, 398 (1977)

(quotation omitted); see also 2 W. LaFave et al., Criminal Procedure § 6.4(e), at 668-82 (3d ed. 2007). Because judicial criminal proceedings had not yet been initiated against defendant at the time of the interview, his Sixth Amendment right to counsel was not violated, even if defendant unambiguously requested counsel.

¶ 19. In making his Sixth Amendment claim, defendant relies upon a pre-*Miranda* case, *Escobedo v. Illinois*, 378 U.S. 478 (1964). Defendant asserts that *Escobedo* recognizes a right to counsel before formal judicial proceedings are commenced when, among other things, an "investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect." *Id.* at 490. Despite contrary language in *Escobedo* itself, later authority makes clear that *Escobedo* applies only to a defendant's Fifth Amendment rights. See *Moran v. Burbine*, 475 U.S. 412, 429 (1986) ("At the outset, subsequent decisions foreclose any reliance on *Escobedo* and *Miranda* for the proposition that the Sixth Amendment right, in any of its manifestations, applies prior to the initiation of adversary judicial proceedings. Although *Escobedo* was originally decided as a Sixth Amendment case, the Court in retrospect perceived that the prime purpose of *Escobedo* was not to vindicate the constitutional right to counsel as such, but, like *Miranda*, to guarantee full effectuation of the privilege against self-incrimination." (quotations omitted)); *United States v. Gouveia*, 467 U.S. 180, 188 n.5 (1984) ("[W]e have made clear that we required counsel in *Miranda* and *Escobedo* in order to protect the Fifth Amendment privilege against self-incrimination rather than to vindicate the Sixth Amendment right to counsel."). Hence, *Escobedo* does not support defendant's claim that his Sixth Amendment right to counsel was violated.[7]

*Affirmed.*

---

[7] The right recognized in *Escobedo* has also been limited to arising only when the suspect is in police custody. See, e.g., *State v. Kelter*, 426 P.2d 500, 501 (Wash. 1967) ("Custodial interrogation is an essential element of the *Escobedo* exclusionary rule."). The rationale for this limitation arises from the text of *Escobedo* itself, the holding of which was cautiously limited to the facts of that particular case:

> We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting

¶ 20. **Johnson, J.**, dissenting. Requiring officers to apprise persons in police custody of their rights acts as a check on the use of coercive interrogation tactics in situations where the balance of power tilts heavily in favor of law enforcement. The Supreme Court in *Miranda* was particularly concerned with the potential for compelled speech that exists when an individual is "swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to . . . techniques of persuasion." *Miranda v. Arizona*, 384 U.S. 436, 461 (1966). In its narrow analysis of what amounts to "custody" for purposes of *Miranda* warnings, the majority loses sight of these fundamental safeguards meant to curb police coercion. Because I believe that the totality of the circumstances indicate that what started out as a consensual, noncustodial encounter between defendant and the police quickly turned into a custodial interrogation, I cannot agree with the majority that just before defendant's fourth, fifth, and sixth confessions, a reasonable person in defendant's position would have felt free to terminate the interview and leave. I, therefore, respectfully dissent.

¶ 21. Determination of custody is a fact-specific inquiry. It is, thus, necessary to preface any analysis with a full recitation of the relevant facts. It is undisputed that defendant was approached by an officer at a convenience store, was asked to accompany that officer to the police station for questioning, and was driven to the police station in a police cruiser. Upon arriving at the police station, defendant was taken to a small, windowless room and assented to police questioning by two uniformed officers. At the outset of the questioning, defendant was told that he was there voluntarily, that the door was unlocked, and that defendant was free to go at any time. Over the next twenty minutes, defendant confessed to setting three fires. The majority's recitation of facts with regard to the subsequent critical time period of 11:26 p.m. to

---

incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied "The Assistance of Counsel" in violation of the Sixth Amendment to the Constitution as made obligatory upon the States by the Fourteenth Amendment, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial.

378 U.S. at 490-91 (quotation omitted).

12:15 a.m., however, does not go far enough in giving a clear picture of what happened. The videotape of the police interview was admitted into evidence at defendant's suppression hearing and indicates that the nature and tone of the interview changed during this period. Review of the videotape reveals the following facts.

¶ 22. At 11:26 p.m., one of the officers offered to make arrangements to pick up defendant's wife from work. Defendant responded that he was going to pick her up. At that point, the following exchange occurred:

> Officer: I'd like to talk to you for a little while longer and here's the reason why, okay? I haven't told you everything I know about these fires when I walked in here tonight, alright? One of the other things I'd like to do is start telling you a little bit more about what we know, okay? In fact, we've got you coming from the scene of many of these fires.

> Defendant: 'Cause I actually came . . .

> Officer: Okay, but let me finish where I'm going with this . . . . This didn't just start out of the blue. You did three fires tonight in succession. . . . When I go back to your photograph, people are going to recognize you? . I'm going to ask you a question, and I need you to be 100% honest with this, because this is where we're going to start going up or down with things. And by that I mean, I'm a patient man to a reason, to a point. Have I been fair with you so far?

> Defendant: Yeah

> . . . .

> Officer: What we told you is that you can leave any time, correct?

> Defendant: Okay.

> Officer: You came in here of your own free will, correct?

> Defendant: Yeah.

> Officer: Did you understand that?

> Defendant: Yeah.

Officer: Did you understand when [the other officer] and I came in here that I told you when you came in here, if you want to leave, you could leave.

Defendant: I still think I should have a lawyer here.

Officer: That's going to be up to you. Are you asking for a lawyer or do you want to still talk about this — because to me you're not sure. If you want to talk some more about this because it's important we get everything out on the table all at once.

Defendant: I know deep down in my heart I'm not the one who did all these [fires].

At this point, the second officer reentered the room, and the following exchange occurred:

Officer [to second officer]: I have to make you aware of one thing. [Defendant] has brought up the fact that he's not sure if he should have a lawyer . . . .

Defendant: But I'm being honest . . . .

Officer [to second officer]: I asked him if he wanted to continue talking and he said yes.

Second Officer: That door is not locked, [Defendant], you're free to go. . . . [W]e want these fires to stop. We know there's a reason why you're starting these fires.

Defendant: I'm not the one doing them all.

¶ 23. Questioning about whether defendant was responsible for certain fires resumed. The questioning took the form of the two officers consulting a list of dates, times, and locations of fires set in the area and asking defendant, incident by incident, if he was responsible. The officers asked questions in quick succession, at times interrupting and talking over both each other and defendant. At 11:32 and 11:33 p.m., defendant confessed to two more fires.

¶ 24. For the next ten minutes, the officers questioned defendant about a series of fires that occurred over the previous year. The tactics employed by the officers to elicit confessions from defendant included telling defendant that there was no difference between setting one fire or twenty-one fires and that there was

surveillance tape of defendant at several fire scenes. Just before the third confession, which occurred at 11:48 p.m., one of the officers referenced video and pictures of defendant at the crime scene and began this particular line of questioning by saying, "you wanted to start that little fire and it got out of hand." Defendant then began to describe that particular fire.

¶ 25. The questioning continued in a similar fashion for approximately ten more minutes, after which the two officers left defendant alone while they conferred. Questioning resumed at approximately 12:10 a.m. At 12:15 a.m., one of the officers asked defendant to wait while the officer prepared a statement for defendant to sign. At that time, defendant indicated that he wanted to leave, to which one of the officers responded "we're not done yet."

¶ 26. Defendant moved to suppress his confessions to six fires, arguing that because he was in custody at the time these confessions were made, the officers were required to apprise him of his *Miranda* rights. After a suppression hearing, the trial court concluded that before 12:15 a.m. defendant was not in custody, finding that: (1) defendant went voluntarily to the police station for questioning; (2) the door to the interview room was closed, but it was not barricaded in any way and defendant had access to it; (3) at 11:29 p.m., defendant inquired about whether he should have counsel and the officer made it clear that if defendant wanted to have a lawyer, he had a right to do so, but defendant never invoked this right; (4) the police could not have made it any clearer to defendant that he was free to leave; and (5) there "was no evidence on the video or from any testimony that [defendant] was deprived of his freedom of action in a significant way." The court found that at 12:15 a.m. defendant indicated he wished to leave and that the officer stated that they were not done yet. The court found that from that point on defendant "was in a circumstance where he was not free to leave."

¶ 27. On appeal, defendant contends, in part, that the trial court erred in finding that he was not in custody after 11:26 p.m. Defendant argues that after he had confessed to three fires he was in custody for purposes of *Miranda,* and in the absence of *Miranda* warnings, the subsequent three confessions should have been suppressed. Defendant brings his arguments under the Fifth

and Sixth Amendments to the United States Constitution, and Chapter I, Article 10 of the Vermont Constitution.[8]

¶ 28. Under the standard of review set forth by the majority, we review the trial court's legal conclusions de novo and its findings of fact under a clearly erroneous standard of review. *State v. Pontbriand*, 2005 VT 20, ¶ 12, 178 Vt. 120, 878 A.2d 227. The U.S. Supreme Court has clarified the analysis to be employed on review by articulating a two-part test to determine whether a person is in custody for *Miranda* purposes — a test this Court has adopted. *Id.* First, a court must determine the circumstances surrounding the interrogation; and second, the court must determine if, given those circumstances, a reasonable person would have felt he was free to leave. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). In *Thompson*, the Court characterized the latter inquiry as to whether a reasonable person would have felt he was free to terminate the questioning as a "mixed question of law and fact qualifying for independent review." *Id.* at 112-13 (quotation omitted). It is thus the job of this Court to review the record facts and make the ultimate determination of whether a defendant was or was not in custody.

¶ 29. The majority accuses me of looking "beyond the trial court's findings of fact and engag[ing] in appellate fact-finding." *Ante*, ¶ 13 n.6. The majority, however, mischaracterizes the two-part standard set forth in *Thompson* and my application of that standard here. With regard to the first part of the inquiry — determining the circumstances surrounding the encounter — the trial court's findings that defendant voluntarily left the convenience store, accompanied an officer to the police station, was not handcuffed, and was in an interview room with a door that was unlocked, are factual findings and should be reviewed under the "clearly erroneous" standard articulated by the majority. *Ante*, ¶ 13.

---

[8] The majority has analyzed defendant's claim under the Fifth Amendment to the U.S. Constitution, see *ante*, ¶ 8 n.1, and I have responded to that analysis here. Although defendant also raised the issue under Chapter I, Article 10 of the Vermont Constitution, this is not an area of constitutional jurisprudence where we have substantially departed from federal decisions or where there is a choice to be made between different lines of analysis. See *In re C.C.*, 2009 VT 108, ¶ 17, 186 Vt. 474, 987 A.2d 1000 (Johnson, J., concurring). Therefore, I do not separately analyze the Vermont constitutional issue because my dissent and the resulting outcome would be the same.

¶ 30. Despite being charged with examining "all of the circumstances surrounding the interrogation," *Stansbury v. California*, 511 U.S. 318, 322 (1994), the trial court made virtually no factual findings on the critical period of time at issue here — 11:26 p.m. to 12:15 a.m. The majority, therefore, errs in describing all of the conclusions drawn by the trial court as "factual findings." *Ante*, ¶ 13. Rather, the trial court's findings that the police could not have made it any clearer to defendant that he was free to leave and that there was no evidence that defendant was deprived of his freedom of action in any significant way are legal conclusions and are subject to independent review from this Court. See *Pontbriand*, 2005 VT 20, ¶ 12. Given our charge to make an objective inquiry into the totality of the circumstances and determine the ultimate legal question of whether those circumstances amount to a custodial encounter, our only option here is to look to the evidence presented before the trial court.

¶ 31. This type of analysis is not a novel concept in cases reviewing a motion to suppress where an appellate court is asked to look at the *totality of the circumstances* and determine whether a suspect was in custody for purposes of *Miranda*. Moreover, though we defer to a trial court's credibility determinations, where the evidence is a videotape of a police encounter and where officers have testified that the videotape fully and accurately depicts the police interview, there are no issues of credibility. In this situation, it is not only permissible, but indeed necessary, for an appellate court to view this evidence to ascertain what the totality of the circumstances were. See, e.g., *Graham v. United States*, 950 A.2d 717, 721 (D.C. 2008) (appellate court evaluated videotaped interview to determine whether a confession was admissible); *State v. Payne*, 149 S.W.3d 20, 25 (Tenn. 2004) ("[D]etermining whether the defendant was in custody is a fact-intensive inquiry which demands a careful, de novo review of the videotaped interview, followed by an application of the governing legal principles.").

¶ 32. In determining whether a person is in custody for purposes of *Miranda*, there are few bright-line rules. Determinations are thus fact-specific and based on the totality of the circumstances surrounding the police encounter. Though every police encounter will have coercive elements, to rise to the level of a custodial interrogation the totality of the circumstances must be such that a reasonable person would believe he was not free to

terminate the questioning and leave. See *State v. Willis*, 145 Vt. 459, 473-75, 494 A.2d 108, 115-17 (1985); see also *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam) (looking to whether suspect was "no longer free to go"). Federal and state courts grappling with this issue have employed a number of factors to make this determination, including:

> (1) the location of the interrogation and whether it was a place where the defendant would normally feel free to leave; (2) whether the contact with the police was initiated by [the police] or by the [defendant], and, if by the police, whether the defendant voluntarily agreed to the interview; (3) whether the defendant was told he or she was free to terminate the interview and leave at any time; (4) whether there were restrictions on the defendant's freedom of movement during the interrogation; (5) whether neutral parties were present at any time during the interrogation; (6) the duration of the interrogation; (7) whether the police verbally dominated the questioning, were aggressive, were confrontational, were accusatory, threatened the defendant, or used other interrogation techniques to pressure the [defendant]; and (8) whether the police manifested to the defendant a belief that the defendant was culpable and that they had the evidence to prove it.

*State v. Rogers*, 760 N.W.2d 35, 54 (Neb. 2009). This analysis is a fact-intensive inquiry of the totality of the circumstances, and no one factor is determinative. *Id.*

¶ 33. Whether a suspect is in police custody is largely determined by whether he is interrogated in a "police-dominated atmosphere." *Miranda*, 384 U.S. at 456. A police-dominated atmosphere "results when law enforcement officers take action to fetter the suspect's freedom of movement during the interrogation," including isolating the suspect "in an enclosed space." *Pontbriand*, 2005 VT 20, ¶ 16. Although the fact that an interview takes place within a police station is not dispositive, it is a factor suggestive of custody. Compare *State v. Clark*, No. 2003-031, 2003 WL 25745414, at *2 (Vt. June 26, 2003) (unpublished mem.), available at http://www.vermontjudiciary.org/d-upeo/eo03031.aspx (holding that defendant was in custody when questioning occurred in nonpublic area of sheriff's office), with *State v. Peck*, No. 2007-080,

2007 WL 5313527, at *2 (Vt. Oct. 18, 2007) (unpublished mem.), available at http://www.vermontjudiciary.org/d-upeo/eo07-080.pdf (holding that defendant was not in custody when questioning occurred in public place during time when public was present).

¶ 34. In addition, the nature of the questioning itself, including the use of leading questions and deceptive police tactics, helps to create a coercive environment. *Rogers*, 760 N.W.2d at 55 ("[S]urely a reasonable person would conclude he was in custody if the interrogation is close and persistent, involving leading questions and the discounting of the suspect's denials of involvement."); see also *United States v. Axsom*, 289 F.3d 496, 500-01 (8th Cir. 2002) (considering "whether strong arm tactics or deceptive strategems were employed during questioning" as a factor which, if present, aggravates the existence of custody (quotation omitted)); *People v. Lira*, 742 N.E.2d 885, 891 (Ill. App. Ct. 2001) (treating that "the mood of the interview was that of a serious interrogation" as a factor indicating the defendant was in custody); *State v. Bridges*, 2003 ME 103, ¶ 30, 829 A.2d 247 ("[The] close and persistent line of interrogation, which involved leading questions and challenged [the suspect's] denials of involvement, strongly suggests that [the suspect] could not help but believe she was in custody.").

¶ 35. The majority makes much of the fact that the officers told defendant that he was free to leave. Although the fact that a suspect is told at the outset of an interview that he is free to leave suggests a noncustodial situation, such statements are not determinative of custody. *Pontbriand*, 2005 VT 20, ¶ 19 (noting that statements by officers that suspect is not under arrest, is not required to talk to them, and is free to go, are "not dispositive" for purposes of determining whether the suspect was in custody); *State v. Brunell*, 150 Vt. 388, 392, 554 A.2d 242, 244 (1988) (concluding that continued assertions by officers that the defendant was not in custody, "pursuant to their plan to avoid having to give *Miranda* warnings," cannot overcome other factors indicating custody); *State v. Hassan*, 2007 ME 77, ¶ 17, 925 A.2d 625 (concluding that the suspect was in custody despite acknowledging at the outset of the interview that he was there voluntarily when other indicia of custody existed); *Bridges*, 2003 ME 103, ¶ 28, 829 A.2d 247 (finding that even when officers told suspects they were free to leave, the existence of other factors indicative of custody nonetheless created a custodial situation).

¶ 36. Where the questioning is particularly accusatory or aggressive, statements that the defendant is free to leave become no

more than rote recitals designed to circumvent a duty to inform a suspect of his *Miranda* rights. See *Brunell*, 150 Vt. at 392, 554 A.2d at 244. In *Brunell*, we concluded that a suspect was in custody despite statements made by police that he was free to refuse to accompany them to the police station for questioning. *Id.* We held that because the police initiated the encounter, the suspect was driven to the police station in a police cruiser late at night, and the suspect was questioned by two officers in a small room outside the presence of his wife, a reasonable person would not have felt free to actually leave. *Id.*; see also *State v. Jennings*, 929 A.2d 982, 987-89 (N.H. 2007) (concluding that suspect was in custody despite officer's statements otherwise when suspect was "whisked away to the unfamiliar surroundings of the police station" and aggressively questioned behind the closed doors of an interview room); *Payne*, 149 S.W.3d at 33-35 (concluding that suspect was in custody when aggressive and accusatory questioning took place while the defendant was isolated in an interrogation room within the police station, despite officer's statement that he could leave). Simply put, there are times when actions speak louder than words.

¶ 37. As the majority correctly states, whether a suspect has confessed to an illegal act and the nature of the illegal act to which he confessed is a widely recognized factor to be considered in determining whether the suspect was in custody. See *ante*, ¶ 14; see also *United States v. Chee*, 514 F.3d 1106, 1114 (10th Cir. 2008). This factor, however, is not dispositive. Courts are fairly divided as to the appropriate weight to be given to admissions when determining if custody existed; in addition to the cases cited by the majority where courts have given less weight to the presence of an admission, other courts have decided differently on this question. See, e.g., *Jackson v. State*, 528 S.E.2d 232, 235 (Ga. 2000) ("A reasonable person in [the defendant's] position, having just confessed to involvement in a crime in the presence of law enforcement officers would . . . perceive himself to be in custody."); *People v. Carroll*, 742 N.E.2d 1247, 1250 (Ill. App. Ct. 2001) (finding that custodial situation began when investigation had become focused exclusively on the defendant and he had inculpated himself in the crime); *Ackerman v. State*, 774 N.E.2d 970, 978-79 (Ind. Ct. App. 2002) (finding that admission of misdemeanor offense of leaving scene of an accident was a factor suggesting that the defendant was in custody); *People v. Ripic*,

587 N.Y.S.2d 776, 782 (App. Div. 1992) (finding it "utter sophistry" to suggest that person who had just made an incriminating statement concerning the crime officers were investigating would feel she was free to leave). A consideration of this factor alone does not answer the question before us.

¶ 38. When I consider all of the factors that contribute to the totality of circumstances surrounding defendant's interrogation, not just defendant's confession to three apparent misdemeanors, the conclusion is overwhelming that defendant was in custody at 11:26 p.m. Defendant was approached by police. He was driven to the police station in a police cruiser late at night. Upon arriving at the police station, defendant was taken to a small, windowless room where he was questioned by two officers behind a closed door. Questioning that takes place behind the closed doors of a police station, rather than a public area, is precisely the "police-dominated" situation that we have found warrants heightened attention to the presence of possible police coercion. See *Clark*, 2003 WL 25745414, at *2.

¶ 39. The questioning consisted of two officers consulting a list of dates, times, and details of forty-six fires started in the area over the past year. The officers then used this list to question defendant, incident by incident. During this pressured questioning, the officers spoke over and interrupted both each other and defendant. The officers conducting the interview testified at the suppression hearing that they used fabricated statements such as "we have surveillance videotape of you setting those fires" and "admitting to one fire is no different than admitting to one hundred fires" to elicit more confessions from defendant. The officers also used leading questions to elicit confessions such as, "you wanted to start that little fire, and it got out of hand," most notably to prompt the sixth confession from defendant.

¶ 40. Under this kind of accusatory and aggressive questioning, a reasonable person in defendant's position would not have felt able to interrupt the questioning and leave the interview. Instead, the use of such tactics compounded the coercive nature of the encounter such that defendant's only apparent recourse was to attempt to defend himself by denying wrongdoing. This technique kept him in the interview and forced him to participate in the questioning. This is a police tactic we have seen before; indeed, the use of leading questions and subterfuge to ascertain a confession is not, in and of itself, dispositive of the existence of

custody. See *Mathiason*, 429 U.S. at 495-96 (holding that custody not established despite use of incriminating and fabricated evidence). In conjunction with other indicia of custody, however, the use of such tactics is an important factor in assessing whether the encounter was coercive.

¶ 41. Nor does the fact that defendant was unequivocally told at the outset of the interview that he was free to leave negate any unconstitutional conduct that followed. In this interview, it is obvious that the nature and tenor of the questioning changed dramatically over the course of the interview, effectively negating the assurances that defendant was, in fact, free to walk out the door. See, e.g., *State v. Dedrick*, 564 A.2d 423, 427 (N.H. 1989) (finding that "sea change" in police demeanor and tenor of interview converted what started as noncustodial encounter to custodial one), *abrogated in part on other grounds by State v. Spencer*, 826 A.2d 546, 550-51 (N.H. 2003).

¶ 42. Moreover, when the officers reiterated statements made at the outset of the interview that defendant could leave, these "assurances" were followed immediately by such statements as, "we've got you coming from the scene of many of these fires"; "it's important we get everything out on the table all at once"; or "I just want to talk to you a little while longer." In other words, there was no pause to see whether defendant would take the opportunity to leave because the questioning immediately resumed. For instance, when one officer pointed to the door and asserted "[t]hat door is not locked, [defendant] — you're free to go," before defendant could respond, the officer immediately directed the conversation back to the subject matter stating, we "want these fires to stop. We know there's a reason why you're starting these fires." Similarly, during the exchange in which defendant indicated he may want a lawyer present, the officers effectively ignored defendant's concerns. In fact, defendant was never given an opportunity to actually assert his right to speak with counsel.

¶ 43. Though the officers may have uttered the words "you are free to leave" to defendant, this situation is more akin to the circumstances in *Brunell*, in which the actions of the officers, including accusatory, late-night questioning at the police station, refuted any verbal assertion that the suspect could leave. 150 Vt. at 392, 554 A.2d at 244.

¶ 44. As I noted earlier, the majority directs much attention to the fact that defendant's first three admissions involved apparent misdemeanors, instead of more serious crimes, in concluding that defendant was not in custody before 12:15 a.m. *Ante*, ¶¶ 14-15. Although it is likely that an admission to any criminal act — whether a misdemeanor or not — would cause a reasonable person to believe he was unable to terminate police questioning, it is still but one factor to consider. The majority's focus on this factor to the exclusion of the other factors discussed above results in a narrow analysis that fails to address the totality of the circumstances surrounding the encounter.

¶ 45. Finally, the trial court and the majority create an artificial distinction between the circumstances that existed at 11:26 p.m., when the court found the encounter to be noncustodial, and those that existed at 12:15 a.m., when the trial court found defendant to be in custody. At 11:26 p.m., an officer asked defendant whether he needed someone to pick up his wife from work, indicating to defendant that the questioning was far from over. The officer responded that "I just want to talk to you a little while longer," followed immediately by "I'm going to ask you a question, and I need you to be 100% honest with this because this is where we're going to start going up or down with things. And by that I mean, I'm a patient man to a reason, to a point." The statement that "I just want to talk to you a little while longer" and the context in which it was made is no different from the officer's statement at 12:15 a.m. — "we're not done yet" — that the trial court found to mark the beginning of custody. In both of these situations, the officer made it apparent that questioning would continue regardless of defendant's prior commitments, obligations, or desire to leave.

¶ 46. By attempting to distinguish the dynamics present at 11:26 p.m. from those that existed at 12:15 a.m., the trial court and the majority seem to imply that a suspect is "in custody" only when he explicitly asks to leave and is told in no uncertain terms that he cannot. This narrow definition of custody is contrary to Vermont and federal case law as well as the fundamental notions of justice on which *Miranda* is premised. To determine whether a suspect is in custody, a trial court is tasked with looking at the totality of the circumstances, upon which, the court must make a determination of whether or not a reasonable person would have felt free to terminate the questioning and leave. *Willis*, 145 Vt. at

473-75, 494 A.2d at 115-17. This determination is based on an objective assessment and should not turn on a suspect's or officer's subjective view of the situation. *Id.*; see also *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) (concluding that undisclosed, subjective intent of officer has no bearing on whether suspect is in custody; instead, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation"). That objective assessment does not depend on whether the suspect has attempted to leave and been prevented from doing so. If that were true, there would be no need to consider the numerous factors that make up the totality of circumstances that we and other courts have historically considered in determining whether a suspect is in custody.

¶ 47. The totality of the circumstances indicate that defendant was in custody just before his fourth, fifth, and sixth confessions. As a result, defendant should have been advised of his right to remain silent. Because he was not, I would reverse the trial court's denial of defendant's motion to suppress and suppress the three admissions made after 11:26 p.m.[9]

---

[9] On appeal, defendant also argues that his requests for counsel were denied in violation of his Fifth and Sixth Amendment rights. I concur with the majority's treatment of defendant's Sixth Amendment claim. *Ante*, ¶¶ 18-19. Because I would find that defendant was in custody before his fourth, fifth, and sixth confessions and would suppress those confessions on this basis, it is unnecessary to address defendant's claim that his request for counsel should have caused the officers to immediately cease all questioning.